**SO ORDERED.**

**SIGNED this 27th day of September, 2018.**

_____
BENJAMIN A. KAHN
UNITED STATES BANKRUPTCY JUDGE

---

```
                UNITED STATES BANKRUPTCY COURT
                MIDDLE DISTRICT OF NORTH CAROLINA
                        DURHAM DIVISION

In re:                       )
                             )
NC & VA Warranty Company,    )   Case No. 15-80016
Inc., dba 1st Choice         )
Mechanical Breakdown         )   Chapter 7
Coverage,                    )
                             )
              Debtor.        )
_____)
                             )
Sara A. Conti, Trustee for   )
NC & VA Warranty Company,    )
Inc., dba 1st Choice         )
Mechanical Breakdown         )
Coverage,                    )
                             )
              Plaintiff,     )
                             )
v.                           )   Adversary No. 15-09032
                             )
The Fidelity Bank and        )
Dealers Assurance Company,   )
                             )
              Defendants.    )
_____)
```

## MEMORANDUM OPINION DENYING MOTIONS FOR SUMMARY JUDGMENT

This Adversary Proceeding is before the Court on the Motion

for Summary Judgment and Memorandum in Support, ECF No. 178

1

("Fidelity's Brief"), filed by Defendant Fidelity Bank ("Fidelity") and the Motion for Summary Judgment, ECF No. 184 ("Dealers' Motion for Summary Judgment"), filed by Defendant Dealers Assurance Company ("Dealers") (collectively, the "Motions for Summary Judgment"), Dealers' Memorandum of Law in Support of Motion for Summary Judgment, ECF No. 185 ("Dealers' Brief"), Fidelity's Reply in Support of Summary Judgment, ECF No. 196 (Fidelity's Reply), and Dealers' Reply Memorandum in Support of Motion for Summary Judgment, ECF No. 197 (Dealers' Reply).  For the reasons set forth herein, the Motions for Summary Judgment will be denied.

### Jurisdiction and Authority

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334.  Under 11 U.S.C. § 157(a), the United States District Court for the Middle District of North Carolina has referred this case and this proceeding to this Court by its Local Rule 83.11.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(H), in which this Court has statutory authority to enter final judgments.  The parties have consented to this Court entering final judgments on all matters.  See Revised Joint Scheduling Mem., ECF No. 126.  The Court has constitutional authority to enter final judgments in this adversary proceeding. Wellness Int'l Network, Ltd. v. Sharif, --- U.S. ---, 135 S. Ct. 1932, 1947 (2015).

## Procedural History

NC & VA Warranty Co., Inc. ("NCVA" or "Debtor") commenced the underlying bankruptcy case by filing a voluntary petition for relief under chapter 7 on January 7, 2015.  Plaintiff serves as the duly appointed chapter 7 trustee under 11 U.S.C. §§ 701(a) and 702(d).  Sara A. Conti, as chapter 7 trustee of Debtor ("Plaintiff") commenced this adversary proceeding against Fidelity on August 3, 2015.  Compl., ECF No. 1.  In response, Fidelity filed its answer and counterclaim, ECF No. 5, and a third party complaint against Dealers.  ECF No. 6.  Plaintiff timely filed her answer to the counterclaim.  ECF No. 33.  Plaintiff subsequently filed her motion to amend the complaint, seeking to add Dealers as a party defendant and to assert various claims against Dealers.  ECF No. 63.[1]  The Court allowed the amendment in part and denied it in part by Memorandum Opinion ("Amendment Opinion") and Order.  ECF Nos. 84, 85.  Plaintiff filed her consolidated Amended Complaint, ECF No. 88, against both Fidelity and Dealers.  The Amended Complaint asserts a claim against Dealers for breach of contract,[2] and

---

[1] The motion to amend, which was itself amended pursuant to prior order, ECF No. 57, originally sought to add US Bank, N.A. ("US Bank") as an additional party defendant.  Trustee withdrew the portion of the motion seeking to add US Bank.  ECF No. 67.

[2] The sole surviving claim against Dealers is Plaintiff's claim for breach of contract.  Dealers similarly filed a claim, ECF Claim No. 7-2 ("Dealers Proof of Claim"), against the estate under the same contracts that underlie Plaintiff's claims, to which Plaintiff, as trustee, objected.  Obj. to Claim Number 7, In re NC & VA Warranty Co., Inc., Ch. 7 Case No. 15-80016 ("Main Case"), ECF No. 113.  The Court consolidated the claim objection with this adversary proceeding.  Id.; ECF No. 132.

asserts claims against Fidelity for conspiracy, breach of contract, breach of fiduciary duty, negligence, constructive and actual fraud, unfair and deceptive trade practices, aiding and abetting conversion, and unjust enrichment.[3] Both Defendants filed motions to dismiss the Amended Complaint, which the Court denied in its second Memorandum Opinion and Order ("Dismissal Opinion"). ECF No. 122.

Fidelity raises several defenses, including that Debtor, as grantor of the trust, could not have suffered any damages because the trust funds that Fidelity represented it originally received were misappropriated long before Fidelity became trustee. Fidelity further contends that Debtor authorized all of the actions that it undertook through express authority given to the bank on behalf of Debtor by the principal of the fraud and Debtor's agent, Tray Thomas. Finally, Fidelity argues that any claims in tort are barred by North Carolina's economic loss rule.

Dealers argues that it is entitled to summary judgment on Plaintiff's breach of contract claim because Plaintiff's claim is barred by the statute of limitations and there is no evidence it breached the contracts or caused Debtor any damages. Dealers also seeks summary judgment on its affirmative claims against the estate for Debtor's breach of those same contracts, or alternatively,

---

[3] Plaintiff voluntarily dismissed the claim for unjust enrichment. See Voluntary Dismissal, ECF No. 116.

unjust enrichment.  In the Court's prior Amendment Opinion, the Court denied Dealers' motion to dismiss the remaining breach of contract claim.  Amendment Op. 28-33.  Applying the standards under Rule 12(b)(6), the Court denied Dealers' motion because the Court previously permitted Plaintiff to amend the Complaint over Dealers' objection that the amendment was futile and because the allegations in the Amended Complaint were sufficient to invoke equitable estoppel against Dealers' assertion of the statute of limitations for purposes of the motion to dismiss.  Dealers now argues that the record at summary judgment establishes that its defense based on the statute of limitations is not subject to equitable estoppel, and that Plaintiff's breach of contract claim is time barred.

Plaintiff timely responded to the Motions for Summary Judgment.  ECF Nos. 191, 192.  The Court conducted a hearing on the Motions and took the matters under advisement.  The Motions are ripe for determination.

### Factual Background[4]

Fidelity Bank, as trustee, agreed to take possession of over four million dollars in trust to ensure the payment of warranty

---

[4] The facts set forth herein are construed in a light most favorable to the Plaintiff, as the non-moving party.  Nothing herein shall be construed as findings of fact for purposes of Fed. R. Civ. P. 56(g), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7056, unless specifically stated as such.

claims by NCVA's customers or reimbursement of Dealers, and to return the balance of funds to NCVA. Fidelity represented to Dealers and NCVA that it had received those funds, and over the next three years issued ongoing statements reflecting its receipt of the original funds and its continued receipt of further funds into trust that it did not in fact receive, all while failing to disclose to NCVA that it did not hold any trust funds in custody, and charging NCVA fees for fiduciary custodial services that it did not provide. Among other claims for relief, Plaintiff alleges that Fidelity's actions and inactions as a fiduciary abdicated its responsibilities as trustee, breached its contract, breached its fiduciary duties, and facilitated the concealment and continued perpetration of a fraud against Debtor.

Ronnie Thomas was the president and sole shareholder of NCVA.[5] Fidelity's Br. ¶ 5. His son, Tray Thomas, owned and controlled Marbury Advisors ("Marbury"), an unregistered investment adviser. Id.; Dep. Ex. 325, at 1. NCVA provided vehicle service contracts and warranty programs to purchasers of motor vehicles, and was responsible for paying claims under these agreements directly to the insured consumer. Dealers' Br. ¶ 1. Dealers was in the business of re-insuring motor vehicle warranty obligations of the issuers of such warranties, like NCVA. Id. ¶ 3.

---

[5] Ronnie Thomas died on April 6, 2015. Fidelity's Br. ¶ 65.

NCVA and Dealers entered into an Insurance Agreement, ECF No. 88-2, on August 9, 2001.  Id. ¶ 1.  The Insurance Agreement provided that Dealers would insure NCVA's warranty obligations whereby if NCVA were unable to meet such obligations, Dealers would pay the claims directly to NCVA's customers.  Insurance Agreement, ¶ 7(b).

As a condition to providing re-insurance, the Insurance Agreement required NCVA to maintain a letter of credit or a trust account for the benefit of Dealers.  Id. ¶ 6(b).  On November 15, 2005, NCVA established the trust account contemplated by the Insurance Agreement by entering a Trust Agreement ("US Bank Trust Agreement") between and among NCVA, Dealers, and US Bank's predecessor in interest, Wachovia Bank.[6]  Amended Compl. ¶ 14; Fidelity's Br. ¶ 8; Dep. Exs. 2.  The US Bank Trust Agreement provided that US Bank would administer the Trust Account ("US Bank Trust Account") in its name for the sole use and benefit of Dealers, and that funds placed in the US Bank Trust Account by NCVA could not be withdrawn for any purpose other than to pay claims to NCVA's customers or to indemnify Dealers for any claims Dealers paid directly to customers.  US Bank Trust Agreement §§ 1.(a), 3.  Under certain conditions, NCVA was entitled to the interest, dividends, and income generated by the trust assets. Id. § 5.  With the exception of the interest, dividends, and income

---

[6] On or about November 29, 2005, US Bank acquired the institutional and other trust business of Wachovia Bank and as a result US Bank administered the Trust Agreement as a successor in interest after that date.

generated as contemplated by section 5 of the agreement, Dealers
was the only entity given authority to withdraw assets from the US
Bank Trust Account under the US Bank Trust Agreement.  Id. § 2.
Upon termination of the US Bank Trust Agreement, US Bank was
required to distribute all remaining assets in the account to NCVA
on the written consent of Dealers.  Id. §§ 3, 10; Insurance
Agreement § 20.  NCVA deposited into the US Bank Trust Account at
least $4,460,000.00 (the "Trust Funds") between December 15, 2005
and September 1, 2006.  Shumpert Dep. vol. 1, at 44.

From its inception, and despite the terms of the US Bank Trust
Agreement, US Bank began authorizing wire transfers out of the
Trust Account into Marbury's account at Interactive Brokers.
Dealers' Br. ¶ 7.  Despite having permitted the transfer of trust
funds out of the trust account since its inception, NCVA, US Bank,
and Marbury did not enter into a Control Agreement ("Control
Agreement") until March 31, 2009.  Dep. Exs. 3.  The Control
Agreement permitted Marbury to hold the Trust Funds on behalf of
US Bank as trustee in a segregated account in the name of "U.S.
Bank National Association, as Trustee for N.C. & V.A. Warranty,
Inc. and Dealers Assurance Company Trust Funds and Sub-accounts."
Control Agreement ¶ 1.  The Control Agreement further provided
that US Bank would retain legal title to all assets in the account.
Id. ¶¶ 2-3.  Ronnie Thomas signed the Control Agreement on behalf
of NCVA.  Id. at 4.  Pursuant to the Control Agreement, Marbury

8

agreed to disburse the assets held in trust only on the written authority of US Bank, and "to serve the Trustee [US Bank] loyally . . . ." Id. ¶¶ 4-5. The Control Agreement did not purport to ratify prior transactions. Dealers was not a party to the Control Agreement and did not sign or acknowledge it. Id. at 4.[7]

_____

[7] Although Dealers was not a party to the Control Agreement, there is ample evidence in the record on which a fact finder could determine that Dealers was aware of the transfers out of the Trust Account and consented to them. At his August 4, 2015, deposition by counsel for Fidelity, Kirk Borchardt, the President and CEO of Dealers until the fall of 2013, testified that Dealers had consented to the transfer of the funds out of the possession of US Bank. Borchardt Dep. 78, ECF No. 193-1 ("I sent [Dealers' prior president, Robin Ratchford] emails, I think you've seen them, when I learned about the fact that we, meaning [Dealers], had authorized it. Yeah, I was awfully upset."); Id. at 111-112, ECF No. 193-2; Id. at 133-34 ("All the sequence of events came to [sic] together when I found out that we had already agreed to it."); Id. at 169 (as of July 22, 2009, Dealers Assurance was fine with the arrangements that had been made for the trust assets to be deposited at Interactive Brokers); Id. at 255, ECF No. 193-3 ("Wachovia got our consent to move that money."). When asked by counsel whether Ratchford had authorized a Dealers employee, Rhonda Holland, to consent to the transfer, Borchardt responded, "That's my belief." Id. at 131, ECF No. 193-2. Fidelity has attempted to contradict this testimony with a later affidavit from Borchardt, ECF No. 187 ("Borchardt Affidavit"), in support of its motion for summary judgment. In his affidavit, Borchardt contends that he only assumed that Dealers had consented based on a notation in the documentation that the transfer was made pursuant to the written direction of Holland, and that he had no personal knowledge of her authorization or his prior testimony. Id. ¶¶ 13-14. First, the affidavit merely seeks to rebut the authorization and his personal knowledge of the transfers, but does not purport to rebut the fact that others at Dealers knew that the transfers had occurred prior to the inception of the Fidelity trust account. Second, regarding Dealers' consent to the transfers, Fidelity and Dealers cannot rebut the deposition testimony by affidavit in this manner at this stage in the proceedings. Such an argument is improper at summary judgment, where the Court may not make inferences or factual determinations, and must construe all facts in a light most favorable to the non-movant. See Murrell v. Ocean Mecca Motel, Inc., 262 F.3d 253, 255 (4th Cir. 2001); see also St. Paul Reinsurance Co., Ltd. V. Rudd, 67 Fed. Appx. 190, 196, 2003 WL 21387200, at *4 (4th Cir. 2003) ("It is generally inappropriate for a court to make findings of fact in summary judgment proceedings. Instead, the court is obliged to accept and view the facts in the light most favorable to the non-movant.").

Furthermore, construing the record in a light most favorable to the non-moving party, there is additional evidence that Dealers knew and consented to the funds being held by Marbury since the inception of the trust account. Under the US Bank Trust Agreement and with exceptions not relevant for purposes of this discussion, trust assets only could be removed from the account upon Dealers issuing a Withdrawal Notice. See Dep. Ex. 2, §§ 2.(a),(c). In a May 26, 2009 email from Ratchford at Dealers to Toni Shumpert at US Bank, Ratchford requests

Nevertheless, contemporaneous with its execution, on May 11, 2009, US Bank sent a letter confirming the control agreement to Ratchford, who apparently forwarded the letter to Borchardt. Despite the evidence of Dealers' prior knowledge or assent to the transfer of the trust funds out of the account,[8] Borchardt notified

_____

that all trust assets be held at US Bank unless Dealers gives notice that it consents to modification of the US Bank Trust Agreement. See Dep. Ex. 25, at 2. Shumpert responds to Ratchford expressing "confusion," stating that "since the trust account was established . . . we had direction to have Marbury Advisors as Agent purchase securities that are held at Interactive Brokers for the benefit of U.S. Bank as Trustee for NC VA and Dealers Assurance Company Trust." Id. (indicating further that the funds were wired directly to Marbury Advisors "for the initial investment" on January 31, 2006, only two months after the original trust agreement was signed); see also Dep. Ex. 20, at 2 (letter from Ronnie Thomas stating that the parties previously had agreed to permit Marbury to manage the assets as custodian for US Bank); see also Dep. Exs. 20, 28, 31, 32, 38 (Dep. Ex. 38 is an email from Borchardt to US Bank, stating, inter alia, that Dealers "is still interested in accommodating NCVA's desire to have U.S. Bank establish an account at Interactive Brokers . . . ." (emphasis added)), 180 (statement of wire transfer to Marbury Advisors with notation as follows: "RONDA HOLLAND PURSUANT TO WRITTEN DIRECTION DTD 01/31/2006"). Charles Clementson at US Bank purported to verify the authority reflected on the transfer. Id. Although Clementson testified that he received authority for the transfer from Tray Thomas, he does not remember why the notation on Dep. Ex. 180 indicates authority from Holland, does not remember speaking to her, and does not remember whether or with whom he would have spoken to clear up any discrepancy between the wire authorization and the confirmation. Clementson Dep. 87-97. Regardless, Tray Thomas did not have actual or apparent authority to authorize the transfer under the terms of the US Bank Trust Agreement, which would have required, at a minimum, the consent of Dealers, and Cody testified that US Bank followed Tray Thomas's directions regarding the account only if they complied with the terms of the Trust Agreement. Cody Dep. 27. Construing the evidence in a light most favorable to Plaintiff, Borchardt's prior testimony, combined with the deposition exhibits, is sufficient to prevent contradiction or rehabilitation by affidavit, and, at a minimum, leaves a disputed issue of material fact for trial.

[8] Dealers contends in its Reply that Plaintiff may not have it both ways—if Dealers was aware of and consented to the transfers, it could not have relied on Fidelity's misrepresentations and omissions. First, Plaintiff may have it both ways for purposes of defending against motions for summary judgment filed by different defendants. The Court cannot determine a material fact at summary judgment when the record contains sufficient evidence on which a reasonable jury could make a finding other than as proposed by the movant. Instead, the Court must construe all evidence in favor of a non-moving party. With respect to Dealers' motion, the Court must construe the record in favor of its knowledge. With respect to Fidelity's motion, the Court must construe the record in favor of reliance. Second, any lack of reliance by Dealers does not necessarily vitiate reliance by NCVA, but, if the Court determines at trial that Dealers

US Bank that Dealers (now) objected to the Trust Funds being held in the Marbury Advisors account.  Dealers' Br. ¶¶ 27-30.

As a result of Borchardt's objection, US Bank sent a letter purportedly addressed to Ronnie Thomas[9] and Tray Thomas on July 14, 2009, stating that Dealers contended that the account at

---

consented to the transfers, it may make reliance or causation more difficult for Plaintiff to establish against Fidelity by circumstantial evidence.  See Rowan Cty. Bd. of Educ. v. U.S. Gypsum Co., 103 N.C. App. 288, 309, 407 S.E.2d 860, 871 (1991) (Greene, J., concurring in part and dissenting in part) (citing W.R. Grace & Co. v. Strickland, 188 N.C. 369, 373-74, 124 S.E. 856, 858 (1924) for the proposition that the reliance element of fraud may be proven by circumstantial evidence), aff'd in part, review dismissed in part, 332 N.C. 1, 418 S.E.2d 648 (1992).

For the reasons set forth herein, material issues of fact exist and the Court cannot make the inferences requested by the movants—even if those inferences might be more reasonable than their respective counterpoints and even if the inferences drawn in favor of the non-movant on one motion contradict the inferences drawn on the other motion.  See 11 Moore's Federal Practice § 56.24[2](Matthew Bender 3d ed.) ("In deciding a motion for summary judgment, the court may not weigh the evidence to resolve factual disputes, make credibility determinations, or chose which inferences to draw from the facts." (citing, inter alia, Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004) ("court must draw all reasonable inferences in favor of nonmoving party and may not . . . weigh evidence"))); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (weighing evidence and drawing legitimate inferences from the facts "are jury functions, not those of a judge . . . ruling on a motion for summary judgment"); cf. Schwabenbauer v. Bd. of Ed. of City School Dist. of City of Olean, 667 F.2d 305, 314 (1981) (where there are cross motions for summary judgment, court must consider each motion "on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration").

[9] There is no evidence in the record indicating that Ronnie Thomas actually received the letters reflected in Dep. Ex. 31 and 36.  The letters are addressed to a post office box, rather than a physical address.  The record indicates that Tray Thomas set up a post office box for NCVA under his control to prevent information from being delivered to NCVA.  See Lea Dep. 62.  There is a reference in Lea's deposition to Dep. Ex. 227, which purports to refer to the post office box created by Tray Thomas, but Dep. Ex. 227 was not submitted by either party in the record on summary judgment, nor was any other evidence submitted by Defendants indicating that the address for Ronnie Thomas reflected on Dep. Exs. 31 and 36 was an appropriate address at which Ronnie Thomas would or could receive communications.  Even if Ronnie Thomas received the letters, however, Fidelity thereafter signed the Trust Agreement in which it represented that it had taken custodial possession of "99MSCR8K3 U.S. T-Bill" with a value of $3,985,000.00 and $627.75 in accrued interest.  See EXHIBIT A to Dep. Ex. 4.

Interactive Brokers was not in compliance with the requirements of the US Bank Trust Agreement,[10] and that it had requested that Tray Thomas return the funds to US Bank. Dep. Ex. 31. Ten days later, and three years after U.S. Bank began authorizing transfers from the US Bank Trust Account to Interactive Brokers, US Bank sent another similarly addressed letter, admitting that it had not contacted Interactive Brokers directly about the status of the trust account purportedly in its name until that day. Dep. Ex. 36. Having then done so, US Bank learned to its "amazement" that the account was not in US Bank's name. Id. The bank again stated that it had requested that Tray Thomas return the assets to US Bank "until such time a proper account can be activated where U.S. Bank as Trustee will have control of said asset[s]." Id. Several months later, in the fall of 2009, US Bank sent notice to Dealers and NCVA that it had received written notice from NCVA of NCVA's intention to terminate the US Bank Trust Agreement, and that, subject to written approval from Dealers, it would "transfer to the Grantor any Assets remaining in the Trust Account." Dep. Ex. 302. Dealers approved the termination of the US Bank Trust Agreement effective December 1, 2009. Id.

As a result of the termination of the US Bank Trust Agreement, NCVA and Dealers entered into a new Trust Agreement, ECF Nos. 88-

---

[10] The letter did not specify the basis on which Dealers contended that the account was not in compliance with the agreement.

5, 88-6 ("Trust Agreement"), with Fidelity in November of 2009.[11]
Fidelity's Br. ¶ 35.  Prior to entering into the Trust Agreement,
Ronnie Thomas sent a letter to Jonathan Perry, Trust Officer and
director of Fidelity's trust department, providing: "Tray Thomas
is authorized to receive information from the Trustee, provide
information to the Trustee, give direction to the Trustee, and is
an authorized signatory for NCVA Warranty Inc."  Dep. Ex. 160.[12]
No control agreement was executed with respect to the Fidelity
Trust Account.  After the Trust Agreement was entered, and after
Fidelity represented it had received over $3.4 million in trust as
custodian, NCVA provided further corporate resolutions identifying
Tray Thomas as a vice president of NCVA, giving him signature
authority over the deposit accounts with the bank, and ratifying
all actions previously taken by Tray Thomas to the same extent
given in the resolutions as "if said authority [in the resolutions]

---

[11] There were two versions of the Trust Agreement.  See Fidelity's Br. ¶ 36;
Amended Compl. ¶ 32.  The two versions of the Trust Agreement are substantially
similar, but differ in material respects.  See Borchardt Dep. 245-48.  In the
Borchardt deposition, counsel for Fidelity represented that Dep. Ex. 5 "was the
trust agreement that was provided to Fidelity Bank."  Borchardt Dep. 245.  In
the deposition of Jonathan Perry, Trust Officer and director of Fidelity's trust
department, Perry testified that Fidelity never obtained a completed, signed
original of either version.  Perry Dep. 75.  In fact, Fidelity told Tray that
the "official copy" delivered with a putative signature by Ronnie Thomas was
not "good enough," and the bank needed an original signature from Ronnie Thomas.
Id. at 74.  Both versions of the Trust Agreement reflected in the deposition
exhibits purport to attach signature pages containing signatures by Fidelity
and Dealers.  Dep. Exs. 5, 6.  Perry does not know upon which version Fidelity
performed its obligations as trustee.  Perry Dep. 127.  Dep. Ex. 5, however,
contains a bates stamp indicating it was produced by Fidelity.  The record is
insufficient to determine which version controls at this stage.

[12] Ronnie Thomas sent an almost verbatim authorization to Tonya Cody, the trust
officer at US Bank, on October 10, 2008.  Dep. Ex. 201.

had been in effect prior to this meeting . . . ." Dep. Ex. 161; see also Dep. Exs. 162-66 (authorizing, inter alia, Tray Thomas to direct fund transfers on behalf of NCVA). Nothing in these documents purported to modify the Trust Agreement, nor could NCVA have done so unilaterally.

At the time that it agreed to act as trustee, Fidelity only recently had begun handling trust accounts, and none of its officers or board members had prior trust experience. Willis Dep. 21-24; Perry Dep. 31. Fidelity hired Perry as its trust department director, although Perry had only a "cursory" undergraduate-level education in trust administration and no prior work experience or training in that area. Perry Dep. 13, 19-20. Perry had no ability to review the Trust Agreement, which he executed on behalf of the bank, to determine whether the bank was in compliance with its obligations under the agreement or applicable law, nor did he do anything to confirm that the bank had properly taken possession of the trust funds as required by the Trust Agreement and as it represented that it had. Id. at 130-33. Instead, Perry assumed without investigating that the bank's consultants reviewed those issues. Id. ("I did not have the ability to review and determine acceptance of documents.").[13]

---

[13] In contrast, when asked whether these responsibilities were part of his job description as head of the trust department and the person who signed the Trust Agreement on behalf of the bank, Perry replied, "If it was, I never did it. I mean, it was not something that I had the knowledge base to do." Id. at 133. Fidelity's CEO, Mary Willis, testified that these functions were entirely

14

Dealers similarly executed the Trust Agreement.  The record is unclear which version of the agreement was executed by each of the parties, and the Court may not make such a determination in the context of summary judgment.  Borchardt contends that he would not have executed the version represented by Dep. Ex. 5, but does not purport to have a specific recollection of which version Dealers executed.  Borchardt Dep. 245-48.  The signature on both Dep. Exs. 4 and 5 purports to be that of Robin Ratchford's, Dealers' prior president, on behalf of Dealers.  The version of the agreement reflected in Dep. Ex. 5 required Fidelity to take possession of the Trust Funds[14] "for the sole use and benefit of the Beneficiary and Grantor,"[15] and to maintain the funds at "all times separate and distinct from all other assets of the Trustee or any other person or entity at an office or branch of the Trustee in the United States."  Dep. Ex. 5, § 1.(a).  This version of the Trust Agreement permitted withdrawals by Dealers only in the event of a default by NCVA under the insurance agreement.  In the absence

---

Perry's responsibility.   Willis Dep. 144 ("Q: So was it Mr. Perry's responsibility, and his responsibility alone, to both develop the content of that Trust Agreement, have it reviewed by counsel, fully understand exactly what it provided in terms of what Fidelity's duties and responsibilities were? Was that what he was supposed to do? A: Correct.").

[14] Both Dep. Ex. 4 and 5 have attached to them an "EXHIBIT A," purporting to list the assets originally deposited in the Trust Account.  EXHIBIT A to Dep. Ex. 5 is blank.  EXHIBIT A to Dep. Ex. 4 lists "99MSCR8K3 U.S. T-Bill" with a value of $3,985,000.00 and accrued interest of $627.75.  Ratchford testified that Dep. Ex. 4 is the correct agreement.  Ratchford Dep. 162.

[15] Dep. Ex. 4 provides that the trustee is required to take possession of the funds for the sole benefit of the beneficiary.  Dep. Ex. 4, § 1.(a).

of such notice given by Dealers to Fidelity, Fidelity was required
to "allow no substitution or withdrawal of any Asset from the Trust
Account." Id. § 2.(a), (c).[16] Dep. Ex. 4 similarly required
Fidelity to take custodial possession of the funds, and prohibited
the use of the funds by Dealers except for limited purposes. Dep.
Ex. 4, §§ 1, 4.[17] Dealers executed the Trust Agreement even though
it knew at the time that the funds in the US Bank Trust Account
had been transferred to Interactive Brokers in the name of Marbury
Advisors and not returned to the trust account at US Bank.[18] The
agreement further required Fidelity to notify NCVA and Dealers
within ten days of each deposit and withdrawal from the Trust

---

[16] Although § 4 of both versions of the Trust Agreement permitted investment
of trust assets in certain "Eligible Securities" with the consent of both
NCVA and Dealers, it did not authorize removal of the assets from trust other
than for transactional purposes of redeeming matured investments with
immediate deposit of proceeds into the Trust Account.

[17] Dep. Ex. 4 does not require a default by NCVA as a pre-condition to
withdrawals by Dealers.

[18] At the hearing on this matter, counsel for Dealers argued that Fidelity's
execution of the Trust Agreement in which Fidelity represented that it had taken
possession of the funds reassured Dealers that any problem had been solved and
Fidelity had taken possession of the trust funds, but there is nothing
whatsoever in the record to indicate that Dealers asked for or received any
confirmation from Fidelity or US Bank that the funds had been returned. Assuming
that Fidelity's representation of possession assuaged Borchardt's concerns
would require the Court to construe those facts in favor of the movant, Dealers,
which it cannot do at this stage. The Court is required to construe facts in
favor of the non-movant, and in doing so, this same argument can be made to
demonstrate that Fidelity's execution of the Trust Agreement and the
representations therein reassured NCVA and Ronnie Thomas that the funds had
been returned to a custodial trust. Moreover, although the Control Agreement
indicates that Ronnie Thomas was aware that the funds were being held in a
custodial account at Interactive Brokers, nothing in the record indicates that
Ronnie Thomas or anyone else at NCVA knew that the account at Interactive
Brokers was not a custodial account held in the name of US Bank at the time
Dealers signed the Trust Agreement. Borchardt and Ratchford were aware of Tray
Thomas's prior misrepresentations regarding the account at Interactive Brokers.

16

Account, and "[b]efore accepting any additional assets for deposit to the Trust Account, [to] determine that such Asset is in such form that the Trustee whenever necessary may, or the Trustee upon direction will, negotiate such Asset without consent or signature from the Grantor or any person or entity other than the Trustee in accordance with the terms of this Agreement." Id. §§ 7.(a), (b).

Despite the obligations imposed on Fidelity both as a fiduciary and under the terms of its Trust Agreement, Tray Thomas and Perry agreed that Tray Thomas would continue to hold the funds and all further remittances to the trust at Interactive Brokers under the management of Marbury Advisors.[19]  Fidelity's records required the bank to allocate the funds to "All Income," with 95-100% in "Fixed Income" and 0-5% "Cash." Dep. Ex. 136.  Fidelity's internal documentation further reflects that it was to "[t]ake custody of short term U.S. Treasuries," and that the "client's expectations with the account" were for Fidelity to "[p]rovide custody services and provide quarterly statements to insurer."

---

[19] Fidelity contends that neither Debtor nor Dealers informed it that the funds were not in a segregated account at Interactive Brokers and that the only previous account at Interactive Brokers had been under the name of Marbury Advisors.  Nevertheless, Fidelity made affirmative representations that it had taken possession of the funds as trustee, and did not even attempt to ensure that there was an account in its name or NCVA's name at Interactive Brokers, or that such an account contained any assets whatsoever until over two years later. Perry Dep. 108.  Even then, Perry made these attempts only by sending requests to Tray Thomas, rather than by contacting Interactive Brokers directly.  Dep. Exs. 332-336.  It was not until Fidelity's investigation into these matters on April 20, 2012, that Fidelity contacted Interactive Brokers directly "to confirm the existence of any Interactive Brokers LLC accounts in the name of Marbury Advisors-NC&VA Warranty as Fidelity Bank as Custodian."  Decl. of Anthony Sierer ("Sierer Decl.") ¶ 2, ECF No. 179-5.

Id.; Dep. Ex. 137.  Fidelity's Trust Account statements, which were issued to Dealers and made available through the portal to NCVA, reflect a deposit into trust of $3,985,000 on December 31, 2009 and continuing deposits into the Trust Account thereafter. Dep. Ex. 400.  The statements represent that the funds were held by Fidelity.

In fact, by the time Fidelity became trustee in 2009, most of the Trust Funds that were previously transferred from the US Bank Trust Account to the Marbury Advisors account had been lost or transferred out of the Marbury Advisors account with the exception of approximately $202,745.05.[20]  Fidelity's Br. ¶ 24; Ward Aff. 1-2, ECF No. 179-2; ECF No. 180 ("Smith Report"), at 7.  For more than two years, Fidelity continued to record in its account records putative deposits into trust that it never received, reflect these fictitious receipts in its online statements and report them to Dealers, and continued to charge NCVA fees for custodial services that it never provided.  See, e.g., Willis Dep. 26, 180-82; Dep. Exs. 400, 404.

To disguise the fact that the Trust Funds were not at Interactive Brokers, Tray Thomas provided Perry with falsified Interactive Brokers account statements reflecting that the Trust

---

[20] The U.S. Government thereafter seized these remaining funds by civil forfeiture in connection with the federal investigation and prosecution of Tray Thomas.  Main Case, Ch. 7 Trustee's Interim Report 2, ECF No. 94.

Funds were held there in an account under Fidelity's name as custodian for NCVA.  Sierer Decl., Ex. 2-8.[21]  During Fidelity's 2012 investigation into these events, Interactive Brokers confirmed that the statements provided by Tray Thomas were falsified.   Id.   The falsified statements reflected that substantial trust funds were held in an account under the name of "Fidelity Bank as Custodian for NCVA Warranty."  Id. at Ex. 3-8. Not only were the purported values of the assets in the account false, but Interactive Brokers, just as it had with US Bank in May of 2009, also confirmed during the 2012 investigation that it had no current or former accounts that named or listed Fidelity in any capacity, either in its own name or as trustee for NCVA.   Id. at Ex. 2.[22]

---

[21] The Trust Agreement prohibited Fidelity from comingling the trust funds with other assets, regardless whether those funds were held by Fidelity or by a third-party custodian on behalf of Fidelity.  See Perry Dep. 126-29; Trust Agreement § 1.(a).  When Perry requested that Tray Thomas arrange for Fidelity to have a direct feed into its custodial account as it did with all its other custodial accounts, Tray Thomas explained to him that he held and traded the assets at Interactive Brokers under an "umbrella," and that providing direct access would allow Fidelity to see other clients' trades.  Id.  Perry neither understood, nor investigated this statement with Interactive Brokers.  Id.

[22] Instead of establishing an account at Interactive Brokers in Fidelity's name and under Fidelity's control, Fidelity allowed Tray Thomas to prepare and submit an application to create the account.  Willis Dep. 73, 76-77; see Dep. Ex. 135 (providing email address for account correspondence to Jonathan Perry).  The account application at Interactive Brokers identified Jonathan N. Perry as the person authorized to complete the account application.  Id.  Nevertheless, Tray Thomas prepared for Fidelity the requisite paperwork to open an account at Interactive Brokers purportedly in Fidelity's name and under its control.  Id. Despite the application, no account consistent with the terms in the application reflected in Dep. Ex. 135 ever was created or funded.  See Dep. Ex. 325.

These falsified statements were the only bases on which Fidelity accounted for the Trust Funds under the Trust Agreement. Perry Dep. 39-47. In a procedure that Fidelity itself refers to as "shadow accounting," Fidelity input the information from the falsified portable document format (.pdf) statements directly into Fidelity's own account records and statements without any communication with Interactive Brokers or due diligence by anyone at Fidelity. Id.

This arrangement and practice did not exist with any other trust customer of the bank. Id. at 39-40. For every other trust account where assets were held by a third-party custodian, Fidelity had a relationship with the third party where the account information would electronically feed into Fidelity's accounting system on a daily basis. Id. In contrast, Fidelity had no direct access to the assets in the NCVA account. Id. at 42, 49. Fidelity did not verify the accuracy of the statements sent by Tray Thomas or take any steps to confirm that any such custodial account even existed at Interactive Brokers. Perry Dep. 42, 45-46. Fidelity followed these shadow accounting procedures from the inception of the Trust Account in 2009 until 2012, without ever confirming the existence of the account at Interactive Brokers or the funds. Id. at 105, 108-10. Perry did not obtain Trust Committee approval when he put the shadow accounting in place, and, in establishing

and maintaining the trust account in this way, Fidelity violated bank policy.  Willis Dep. 33-34.[23]

Under the Trust Agreement, Fidelity was required to provide NCVA with a statement of assets held in trust at the inception of the Trust Agreement and at the end of every calendar quarter thereafter.  Trust Agreement § 7.(e).[24]  Fidelity did not send written statements to NCVA, but merely provided Tray Thomas with online access to view the Trust Account balance at any time via its electronic statement vendor, Accutech.  Fidelity's Br. ¶ 54; Henderson Aff. ¶ 14, ECF No. 179-4.  Separately, Fidelity provided annual written confirmations to Dealers' auditors, signed by a representative of Fidelity, confirming that significant Trust Funds continued to be deposited and held in the Trust Account. ECF Nos. 88-7, 88-8, 88-9.[25]  Fidelity sent these confirmation

---

[23] According to Perry, "[a] Trust Committee is an oversight committee that is put in place by the board of directors to oversee the trust department at a high level.· The main things they focus on are policies, policies and procedures, who are your investment vendors, are you using qualified people, stuff like that."  Id. at 57.

[24] The US Bank Trust Agreement is substantially identical to both versions of the Fidelity Trust Agreement.  Section 7.(e) of the US Bank Trust Agreement requires the trustee to furnish statements "to the Grantor and the Beneficiary." Dep. Ex. 2 (emphasis added).  Section 7.(e) of both versions of the Fidelity Trust Agreement require the trustee to furnish statements "to the Grantor for the Beneficiary."  Dep. Exs. 4, 5 (emphasis added).  Borchardt testified that he did not know whether this change was intentional, but that it was a mistake for Dealers to sign the agreement with this alteration.  Borchardt Dep. 222-24.

[25] Dealers relied on the reports to its auditors.  See Borchardt Dep. 208 ("If the confirmation statement didn't have the balance we told our auditors we had there, they would come back to us and say, 'You don't have that money there . . . .'").

statements to Dealers in 2010, 2011, and on March 6, 2012.   Id.
The statements issued by Fidelity to Dealers reflected not only
that substantial portions of the initial trust balance remained at
Fidelity, but also that Fidelity continued to take custody of
additional proceeds from sales of warranties into the Trust Account
as contemplated by the agreements between the parties.   Id.; see
also Dep. Ex. 400.

Two years after Fidelity first represented that it received
the initial funds and after Fidelity had continuously represented
the further receipt and custody of additional trust funds from the
proceeds of NCVA's ongoing sales of warranties, Mr. Perry first
attempted to verify the existence of the Trust Funds, but did so
only by contacting Tray Thomas.   On June 29, 2011, Perry sent an
email to Tray Thomas, requesting that Thomas provide Fidelity with
a login and password for "our account(s) with Interactive Brokers"
because the Fidelity auditors "were not a fan of the accounts we
are doing for you and at least want me to be able to see the
accounts without having to get the statements via Marbury."   Dep.
Ex. 346.

After several further and unfruitful inquiries during July,
2011, see Dep. Ex. 351, Perry stated the following in an August
11, 2011 email to Tray Thomas:

> In the face of the Bernard Madoff scheme, our consultants
> are worried about the legitimacy of what is happening in
> these accounts.   They are concerned that we are solely

serving as a conduit to fraudulent activity. They are saying that we solely are getting snapshots of what the account looks like from your firm and not directly from [Interactive Brokers ("IB")], therefore these reports could be fabricated. They were irate when I explained that we were not in fact the owners of the account at IB, that these accounts are under Marbury's umbrella, and we have no way of accessing information on these accounts for reconcilement purposes unless we receive the information through Marbury. They really think we just receive wires in and send them out to a location that has nothing to do with IB. They think we are being used as a fraudulent conduit, basically. They really flipped when I told them that I have had zero contact with our end clients on any of these accounts.

At this point, I am being told that I need to close these accounts by the end of next week if I can't get some process in place where I can do a random daily check on the assets that are in the various accounts independent of anything that Marbury produces. For example, we have two custodians that we use currently. Each of those either has straight through data feed to our trust accounting system that we can reconcile with on a daily basis, or we can go online and view the assets held in our custody account with view only access. They were not satisfied with the plan we came up with yesterday where you may be able to pull off the transactions in the accounts, export them to excel, and then send them to me. They want me to be able to do an independent reconciliation of the accounts at any time independent of anything the [sic] Marbury, or you, have any input on.

Dep. Ex. 332. Despite indicating that Fidelity would close the account if it could not verify the existence of the assets by the following week, Fidelity did not close the account. Perry Dep. 167. Perry informed the bank's CEO, Mary Willis, the internal audit committee, and the bank's trust consultants of these events. Id. at 168-69 ("The best I can remember, I just made sure I

documented everything, I made sure everybody knew what was going on; and then if it was drug out, it was drug out.").

Instead of closing the account, Tray Thomas mollified Perry in a telephone conversation by assuring him that Thomas would find some way to verify the account to provide support for the information in the statements that Fidelity was issuing to Dealers and NCVA through shadow accounting. Id. A month later, on September 13, 2011, having not received access to the putative accounts at Interactive Brokers and having failed to carry through on his repeated threats to close the account in absence of such access, Perry sent an email to Tray Thomas asking him to send Fidelity a "statement snapshot" for "all the accounts we have at IB as of today, and then again at the end of the quarter like normal." Dep. Ex. 354. Perry stated, "I am just doing a spot check on the account as of today's date based on our audit department's request. This is solely a stop gap between now and the time you get the online system set up." Id.

Perry sent further emails to Tray Thomas in October, November, and December of 2011, threatening to close the accounts if Fidelity could not "access [the custodial] account at any time" so that Fidelity could "independently reconcile the assets in the accounts at any time," Dep. Exs. 333, 357, 358, but these emails similarly failed to succeed in obtaining any documentation of the affirmative representations that the bank continued to make as trustee. There

24

is no evidence that Perry or anyone else at Fidelity ever attempted to contact anyone else at NCVA during this time, including Ronnie Thomas.  On December 14, 2011, Perry sent an email to Willis, telling her that he was going to terminate the trust relationship because he could not "get comfortable with the arrangement with Marbury Advisors and not being able to independently verify the assets in the accounts."  Dep. Ex. 365.  Perry justified this purported decision because he did not "want to pay out more money to attorneys than we are making on the accounts."  Id.

In January of 2012, five months after conceding that the bank's own auditors believed it was being used as a conduit for fraud based on information known to Perry since the inception of the account, and with the account still open and operating, Fidelity continuing to charge fees for custodial services that it did not provide,[26] and continuing to falsely and baselessly report the existence, receipt, and maintenance of trust funds that it did not have, Perry again wrote Tray Thomas an email stating that Fidelity had "marked all of the accounts 'pending closed' as we have an FDIC audit starting on Monday," and indicating that Fidelity's internal auditors were concerned that Fidelity did not have "custody of the assets or appropriate accounting controls." ECF No. 193-27, at 9.

---

[26] Fidelity in fact "never took possession of any money at all."  Willis Dep. 128.

25

Fidelity did not formally close the Trust Account until another three months later in March of 2012, and ceased contact with Tray Thomas in April. Fidelity's Br. ¶¶ 58-59; Ex. 413; ECF No. 193-28, at 4. Despite the knowledge of Fidelity's internal auditors, trust consultants, management, and employees that Fidelity had been shadow accounting the Trust Account with no direct access to the funds or any verification of the existence and control of the funds for over two years, Fidelity continued to operate under the Trust Agreement through this time, maintaining the online access to the shadow-accounted Trust Account balance and sending a confirmation statement to Dealers as late as March 6, 2012, reflecting it was holding $3,851,000 in Trust Funds as required by the Trust Agreement. Dep. Ex. 338. During this time, NCVA continued to sell warranties to customers, collect the premiums, and believe that the required reserves were being deposited and held in a custodial account as required and as reported by Fidelity as trustee.

### Standard of Review

Summary judgment is appropriate when the matters presented to the Court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, the Court must construe the "facts

26

and inferences drawn therefrom in the light most favorable to the nonmoving party." Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 179, 183 (4th Cir. 2001). The party moving for summary judgment has the initial burden of proving the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. Celotex, 477 U.S. at 323. Once this initial burden has been met, the nonmoving party must then set forth specific facts sufficient to raise a genuine issue for trial. Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). "A dispute is genuine only if, on the entirety of the record, a reasonable jury could resolve a factual matter in favor of the non-movant." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562 (Fed. Cir. 1987). Determinations of credibility, weighing the evidence, and drawing legitimate inferences from the facts are not appropriate on a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." Id.

The Court may consider any evidence in the record or submitted by the parties if it would be possible to introduce the evidence at trial. See Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible into evidence."); see also

Celotex, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). What matters is not that the parties submit evidence in support or opposition to the motion in an admissible form, but that the "substance or content of the evidence . . . be admissible . . . ." 11 James Wm. Moore et al., Moore's Federal Practice, ¶ 56.91[2] (3d ed. 2014). Moreover, if a party fails to object to the inadmissibility of evidence offered in support of a motion for summary judgment, the Court may deem any objection to admissibility waived and consider the evidence. See Fed. R. Evid. 103(a); see also Local rule 7056-1(c) ("All facts set forth in the statement of the movant shall be deemed admitted for the purpose of the motion for summary judgment unless specifically controverted by the opposing party.").

### Discussion

The Amended Complaint asserts eight remaining claims for relief against Fidelity as follows: (1) conspiracy; (2) breach of contract; (3) breach of fiduciary duty; (4) negligence; (5) actual fraud; (6) constructive fraud;[27] (7) unfair and deceptive trade practices; and (8) aiding and abetting conversion. Plaintiff asserts a claim for breach of contract as the sole remaining claim for relief against Dealers. Amended Compl. ¶¶ 51-84. Fidelity

---

[27] The claims for actual and constructive fraud are denominated under a single claim for relief in the Amended Complaint.

moves for summary judgment in its favor on all claims, asserting that: (1) the record demonstrates that any actions by Fidelity were neither the cause in fact nor proximate cause of any injury to NCVA; (2) it cannot be liable for breach of contract due to impossibility of performance; (3) the non-contract claims are barred by the economic loss rule; (4) the actions of Tray Thomas as NCVA's agent bar any recovery by the Trustee; (5) the fraud claim should be dismissed because NCVA did not actually or justifiably rely on any misrepresentations or omissions by Fidelity; (6) North Carolina does not recognize a cause of action for aiding and abetting conversion; (7) the constructive fraud claim should be dismissed because the record does not indicate any benefit to Fidelity arising out of its alleged breaches of fiduciary duties; and (8) the civil conspiracy claim must be dismissed because it is a dependent and derivative claim, and no other claims should survive. Dealers moves for summary judgment on the surviving breach of contract claim against it, as well as its two counterclaims as further reflected in its proof of claim against NCVA under the same contract. Dealers contends that it is entitled to summary judgment because the Trustee's breach of contract claim is barred by the statute of limitations, and NCVA's knowledge through its agent Tray Thomas and Dealers' lack of knowledge of the transfer of the trust funds out of trust defeat any claim of estoppel by the Plaintiff. Dealers further contends

that, even if Dealers is estopped from asserting the statute of limitations, it did not in fact breach the contract or cause NCVA any damages.  The Court will discuss seriatim each of the bases on which the defendants assert in their respective briefs that they are entitled to judgment as a matter of law, beginning with Fidelity.  Before reaching the respective bases on which Fidelity and Dealers seek summary judgment, however, the Court will address the overlapping arguments made by Fidelity and Dealers regarding the knowledge and authority of Tray Thomas and his status as NCVA's agent.

### Tray Thomas's Authority and Knowledge as Agent of NCVA

Dealers and Fidelity, see Dealers' Br. 2-7, 16-18; Fidelity's Br., passim; Fidelity's Reply 4-7, spend significant portions of their arguments contending that the Plaintiff's claims fail because Tray Thomas was NCVA's authorized agent and Ronnie Thomas's individual attorney in fact based on a 2002 financial power of attorney.  See, e.g., Dealers' Br. ¶ 6; Fidelity's Br. ¶ 30; Dep. Ex. 214.  Based on this agency and authority, Dealers and Fidelity argue, variously, that; (1) Tray Thomas's knowledge is imputed both to Ronnie Thomas and to NCVA; (2) NCVA did not in fact rely or reasonably rely on any of Fidelity's misrepresentations; and (3) NCVA, through its agent Tray Thomas, authorized the Trust Funds to be removed from a custodial trust and NCVA was in the best

30

position to discover the truth.  The record in this case does not support any of these contentions for purposes of summary judgment.

Prior to entering the Trust Agreement, Ronnie Thomas sent a letter to Fidelity establishing that Tray had authority "to receive information from the Trustee, provide information to the Trustee, give direction to the Trustee, and is an authorized signatory for NCVA Warranty Inc."  Dep. Ex. 160.  Thereafter, Ronnie Thomas, on behalf of NCVA, entered the Trust Agreement with Fidelity that expressly required the trust funds to remain in trust, under the custodial control of Fidelity as trustee, and segregated from other funds.  Dep. Ex. 5, § 1.(a).  Nothing in this authorization, nor in the corporate resolutions that followed it, authorized Tray Thomas to modify the terms of the Trust Agreement to which Fidelity subsequently agreed, or to authorize the transfer of funds out of trust to a non-custodial account.[28]

---

[28] Fidelity has asserted facts which are unsupported by, and in some instances contradicted by, Fidelity's citations to the record.  For instance, Fidelity asserts, "In 2007, Ms. Lea expressed concerns to Ronnie Thomas about Tray Thomas setting up a private post office box where the accountants were directed to send financial statements. Lea depo. 63."  Fidelity's Br. ¶ 31.  The cited portions of Ms. Lea's deposition testimony contradict this assertion:

> Q: You regarded this [establishment of a private post office box] as part of Tracy Thomas's effort of cutting you and Barbara out of having information about the finances of the company, right?
> A: Yes.
> Q: And you expressed concern about that to Ronnie, didn't you?
>     MR. BARRETT: Objection.
> A: I don't know whether we – we were just questioning Ronnie, why he was doing all this stuff.
> BY MR. NEWHOUSE:
> Q: Okay.  This tended to reinforce your suspicions and concerns about Tracy's dishonesty, right?
>     MR. BARRETT: Objection.

A: Well, I didn't know whether it was honesty – we knew something was up, but we didn't know what.
BY MR. NEWHOUSE:
Q: And you told Ronnie that you thought something was up, right?
    MR. BARRETT: Objection.
A: Probably not at that time, because Ronnie was a very private person, and he didn't want – I mean we were told when we went to work there, Do not discuss anything out of this office.
BY MR. NEWHOUSE:
Q: Okay.  But you believe that this was part of the effort by Tracy Thomas to prevent you and Barbara from seeing it?
A: I know it.
Q: I'm sorry?
A: I know it is now.
Q: Yeah?  And you thought it was then, right?
    MR. BARRETT: Objection.
A: I had suspicions, yeah.

Lea Dep. 63-64 (emphasis added).  Fidelity further states,

> Ronnie Thomas expressly authorized his son Tray to manage the investments and finances of NCVA, including authorization of wire transfers of funds held in the Wachovia/U.S. Bank trust account to the brokerage account at Interactive Brokers.  Tonya Cody, the U.S. Bank account manager for the NCVA trust account, spoke with Ronnie Thomas on the telephone and received his oral authorization for Tray Thomas to act on behalf of NCVA, particularly in respect to the management of its finances and conducting trades and transactions with the funds held in the trust account.  Cody depo. pp. 21-24.

Fidelity's Br. ¶ 14 (emphasis added).  First, any putative apparent authority in the discussion with Cody was given to US Bank, rather than to Fidelity, and Fidelity does not cite any evidence in the record that Ronnie Thomas made any statements to Fidelity that imbued Tray Thomas with the scope of apparent authority described in the brief.  Nevertheless, even if this authorization had been provided to Fidelity rather than to US Bank, nowhere in the cited testimony does Cody testify that she either asked for or received from Ronnie Thomas NCVA's authorization for Tray Thomas to direct wire transfers of funds held in the Wachovia/US Bank trust account to the brokerage account at Interactive Brokers, much less to a non-custodial account in the name of Marbury Advisors in violation of the requirements of the Trust Agreement.  The communication reflected in Dep. Ex. 201, which she testifies correctly memorialized the authority discussed with Ronnie Thomas on the telephone, see Cody Dep. 26, falls far short of such authorization.  Moreover, Cody specifically testified that she only followed instructions from Tray Thomas that were consistent with the terms of the US Bank Trust Agreement, id. at 27, which required US Bank to take and retain the assets under its control, unless withdrawn by Dealers for a permitted purpose.  See Dep. Ex. 2, §§ 1.(a), 2.(a), 3.  Although the US Bank Trust Agreement permits "the Grantor or its designated advisor or designated portfolio manager" to direct the trustee to invest assets "in the Trust Account in Eligible Securities," nothing in that provision authorizes the trustee to abdicate to the advisor its responsibility to invest the assets as directed or authorizes the advisor to direct the transfer or investment of assets outside the control of the trustee or the trust account.  Id. § 4.(b) (emphasis added).

Generally, in North Carolina, an agent may contractually obligate his principal in three situations: 1) when the agent acts within the scope of his actual authority; 2) when the agent acts within the scope of his apparent authority and the third-party does not have reason to believe that the agent is exceeding his actual authority; and 3) when the principal ratifies the agent's previously unauthorized actions.  Wachovia Bank of N.C., N.A. v. Bob Dunn Jaguar, Inc., 117 N.C. App. 165, 170, 450 S.E.2d 527, 531 (1994).  There can be little dispute that Tray Thomas did not have actual authority from NCVA to transfer trust funds that were required to be held in a custodial account at Fidelity to a non-custodial account at Interactive Brokers under the control of Marbury Advisors.  It would be difficult for Fidelity and Dealers

Further, even if this testimony and evidence could be construed in some manner to support the statements in Fidelity's brief, the Court may not draw any such inferences in favor of the movant on a motion for summary judgment.

Local Rule 7056-1(c) provides: "Each material fact in dispute shall be set forth in a separate paragraph, shall refer specifically to those portions of the record upon which the opposing party relies, and, if applicable, shall state the paragraph number in the movant's listing of facts that is disputed.  All facts set forth in the statement of the movant shall be deemed admitted for the purpose of the motion for summary judgment unless specifically controverted by the opposing party."  In response to a number of the enumerated factual statements in Defendants' briefs, Plaintiff states, "These averments are immaterial . . . ," but then fails to address the accuracy of the averments.  See ECF No. 192, at 2-5.  These responses expose Plaintiff to the potential consequence of admitting stated facts that may be entirely unsupported by the record as set forth above, and about which the Court may disagree as to materiality.  Nevertheless, Courts have broad discretion in applying local rules.  See Phillips v. Ins. Co. of N. Amer., 633 F.2d 1165, 1167 n. 5.  As stated above, a number of the putative facts are unsupported by the citations to the record offered by Fidelity.  Further, a number of Fidelity's statements are mere statements of conclusions to be drawn from facts, rather than statements of specific facts.  For these reasons, and unless otherwise stated herein, the Court has relied on the record submitted by the parties in determining the facts for purposes of summary judgment.

to assert otherwise since both contend that they believed the funds were held in a custodial account in Fidelity's name at Marbury Advisors until the discovery of the fraud in 2012, and permitting the funds to be held in an account outside the control of Fidelity was specifically prohibited by the terms of the Trust Agreement they each signed.  See Dep. Exs. 4, 5.

Similarly, Fidelity and Dealers cannot successfully contend at this stage that Tray Thomas had apparent authority on behalf of NCVA to authorize the transfer of the funds to an account beyond the control of Fidelity as trustee.  "Apparent authority 'is that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possess.'"  Bob Dunn Jaguar, 117 N.C. App. at 170, 450 S.E.2d at 531 (quoting Zimmerman v. Hogg & Allen, 286 N.C. 24, 31, 209 S.E.2d 795, 799 (1974)).  "Whether the agent acts within the apparent scope of his authority is determined by what the principal does, not by the unauthorized acts and contentions of the agent."  Id. at 172, 450 S.E.2d at 532-33.

Third parties who deal with agents must act in good faith and investigate where there is a reasonable basis upon which to believe that the agent is acting beyond the scope of his actual authority. As explained by the North Carolina Supreme Court:

> In the Restatement of the Law of Agency, 2d, § 166, it is said, 'A person with notice of a limitation of an agent's authority cannot subject the principal to

liability upon a transaction with the agent if he should
know that the agent is acting improperly.' Comment (a)
upon this section of the Restatement reads: 'If a person
has information which would lead a reasonable man to
believe that the agent is violating the orders of the
principal or that the principal would not wish the agent
to act under the circumstances known to the agent, he
cannot subject the principal to liability. Any
substantial departure by the agent from the usual
methods of conducting business is ordinarily sufficient
warning of lack of authorization.' In 2A C.J.S. Agency
§ 166, it is said, 'Any apparent authority that might
otherwise exist vanishes in the presence of the third
person's knowledge, actual or constructive, of what the
agent is, and what he is not empowered to do for his
principal.'

Lucas v. Li'l Gen. Stores, 289 N.C. 212, 221-22, 221 S.E.2d 257,

263 (1976). Further,

'A third person dealing with a known agent may not act
negligently with regard to the extent of the agent's
authority or blindly trust the agent's statements in
such respect. Rather, he must use reasonable diligence
and prudence to ascertain whether the agent is acting
and dealing with him within the scope of his powers. The
mere opinion of an agent as to the extent of his powers,
or his mere assumption of authority without foundation,
will not bind the principal; and a third person dealing
with a known agent must bear the burden of determining
for himself, by the exercise of reasonable diligence and
prudence, the existence or nonexistence of the agent's
authority to act in the premises.'

Fleming v. Emp'rs Mut. Liab. Ins. Co. of Wis., 269 N.C. 558, 561,

153 S.E.2d 60, 62 (1965) (quoting 3 Am. Jur. 2d Agency § 78); see

also Hogan v. Forsyth CC, 79 N.C. App. 483, 491-92, 340 S.E.2d

116, 122 (1986) (describing how an employer is not liable for the

actions of his employee where the employee has "departed, however

briefly, from his duties in order to accomplish a purpose of his

own, which purpose was not incidental to the work he was employed to do"). Viewing the record in this case in a light most favorable to NCVA, neither Fidelity nor Dealers undertook reasonable diligence to determine the extent of Tray Thomas's authority in light of the facts known to each.

As stated above, both Fidelity (Dep. Ex. 5, § 1) and Dealers (Dep. Ex. 4, §§ 1(a), (2)(a)) were aware of the contractual requirement that the funds be held under the control of Fidelity as trustee, unless withdrawn at the direction of Dealers for one of the limited purposes set forth in the Trust Agreement. See Dep. Ex. 4, § 3. Where a principal specifically and expressly limits his agent's actual authority in communications with a third-party, the third-party cannot rely on general agency principles to expand the authority of the agent or to override the prior express limitation given by the principal. See Bob Dunn Jaguar, 117 N.C. App. at 170-71, 450 S.E.2d at 531 (holding that a general manager and vice president of the parent company of a car dealership did not have apparent authority to execute a guaranty where the parent company's president previously told the bank that he was the only person who could sign a guaranty on behalf of the parent company).[29]

---

[29] This statement should not be construed to conflict with the general rule that a principal is liable for the torts committed by his agent when the agent is acting on behalf of the principal's business and within the apparent scope of his authority, even when those actions are against the principal's express instructions. See, e.g., West v. F. W. Woolworth Co., 215 N.C. 211, 213-14, 1 S.E.2d 546, 548 (1939). The thrust of apparent authority is not how the principal instructs the agent. Instead, apparent authority focuses on the principal's manifestations of the extent and limitations of the agent's

Further, there is ample evidence in the record from which a trier of fact could determine that both Dealers and Fidelity knew or should have known that Tray Thomas was acting outside the scope of his actual authority and against the wishes of his principal. The relationship between Tray Thomas and Perry reflected a substantial departure from the usual methods of conducting business, and a reasonable jury could find that this substantial departure provided Fidelity and Dealers with sufficient notice of Tray Thomas's lack of authorization. Borchardt stated that he allowed Tray Thomas to control the trust funds even though he did not understand what Tray Thomas was doing. Borchardt Dep. 169-71.[30] Borchardt specifically faulted Fidelity for failing to

---

authority to third parties.  In this case, the contracts between the parties did not permit NCVA or Tray Thomas to direct trust funds in a manner that resulted in the funds being outside the custody and control of Fidelity.

[30] Viewed in a light most favorable to the Plaintiff, this referenced exchange demonstrates not only Tray Thomas's departure from ordinary methods of doing business in a manner that should have alerted Dealers and Fidelity that he was acting outside the scope of his authority, but also Borchardt's failure to engage in reasonable diligence despite his lack of understanding.  Borchardt testified as follows:

> A: A DVP account is an account by which the bank enters into an agreement with an investment advisor that allows the advisor to manage the funds at the bank without ever taking control of the funds.  Most banks have DVP account arrangements.  Trey [sic] represented that his – he had a special investment vehicle that required the sophisticated, high-tech, investment platform that Interactive Brokers had and that U.S. Bank did not have. That platform – or, his investment vehicle was a mathematical algorithm formula created by him and a number of math professors at Harvard that was able to spot U.S. Treasuries that were trading in a range that provided a very quick opportunity to make a profit, and they needed to execute their trades very quickly, and they needed to both spot the opportunity and capitalize on the opportunity, and only Interactive Brokers had that kind of platform of any brokers he was aware of or any clearinghouse. That's why we had the account with Interactive Brokers.  If he said, "I'm just going to invest in U.S. Treasuries generally," or "I'm going to

follow usual bank practices by permitting the funds to leave the bank's control.  Id. at 256 ("Trustees all the time, when there's anything outside the ordinary, simply ask for our consent or check with us so they're held harmless.  Whenever they take any external function and put it outside their scope of potential liability, they ask for us to indemnify and consent to it.").

Tray Thomas's actions also were outside the usual methods of conducting business from the bank's perspective.  Perry testified that Fidelity's relationship with Tray Thomas was a substantial departure from the bank's usual methods and practices, conceding that Fidelity did not have any other trust account where it engaged in shadow accounting without direct access to the purported custodial account.  Perry Dep. 39.

Perry's and Borchardt's written correspondence is further evidence that both Fidelity and Dealers possessed information that a trier of fact could find would lead a reasonable businessperson to believe that Tray Thomas was violating the orders of NCVA and

---

invest in corporate bonds or stock," we'd probably never have left U.S. Bank.  That's the reason.  That's his vehicle.
Q: And you believed him?
A: Yup.  I thought he was a genius.
Q: And you were wrong?
A: I was wrong, yes.
Q: And it was really just part of the scam that he was running, wasn't it?
A: I'm guessing it was.  I still confess some doubt, but I'm assuming it was part of the scam because it seemed a little high-tech to me then.  He had a Harvard e-mail address.  He'd been as polite, and nice, and kind as one could be.  You know, I figured he's the smart guy and I'm not; he really has something here.

that NCVA would not have wished him to remove the funds from the custody of Fidelity under the circumstances.  Perry's own email tacitly concedes that the bank should have been aware that Tray Thomas was acting outside the scope of his authority, describing the reaction of the bank's trust consultants as follows:

> They were irate when I explained that we were not in fact the owners of the account at IB, that these accounts are under Marbury's umbrella, and we have no way of accessing information on these accounts for reconcilement purposes unless we receive the information through Marbury.  They really think we just receive wires in and send them out to a location that has nothing to do with IB.  They think we are being used as a fraudulent conduit, basically.

Dep. Ex. 332.  Borchardt sounded similar alarms in his internal May 30, 2009 email, in which he stated:

> I have no doubt that Tray says the funds are held in trust, but they do not appear to be held by Wachovia or U.S. Bank's trust department.  Shumpert's email indicates that the funds left the bank's physical control in January 2006 and I assume the same is true for all funds generated since then.  This situation is no different than if Dealers Alliance, for example, were to wire several million dollars to my personal account against my pledge that I will hold the funds in trust and register any investments in Dealers Alliance's name. Of course I would always possess the power to move the assets out of Alliance's name, so I don't think anyone would be happy with that kind of arrangement.  How do we know that the funds are really there?  Bernie Madoff invested client funds for over 30 years and gave all of them investment statements, but it turns out that not a single investment was ever made.  When we place the fund in the hands of an institutional trustee, we gain the comfort of knowing that the trust funds are protected.

Dep. Ex. 26. At a minimum, these statements and the other evidence in the record present material issues of fact regarding the nature,

extent, and effect of Tray Thomas's agency which the Court will not determine at summary judgment. See Bob Dunn Jaguar, 117 N.C. App. at 171, 450 S.E.2d at 531 ("[W]here the evidence is conflicting, or susceptible to different reasonable inferences, the nature and extent of an agent's authority is a question of fact to be determined by the trier of fact.").

Similarly, the knowledge of an agent is not imputed to his principal when he is acting outside the scope of his authority. Jenkins Bros. Shoe Co. v. G.V. Renfrow & Co., 151 N.C. 323, 66 S.E. 212, 214 (1909). As explained by the North Carolina Supreme Court:

> As it is the rule that whether the principal is bound by contracts entered into by the agent depends upon the nature and extent of the agency, so does the effect upon the principal of notice to the agent depend upon the same conditions. Hence, in order to determine whether the knowledge of the agent should be imputed to the principal, it becomes of primary importance to ascertain the exact scope and extent of the agency.

Ring Furniture Co. v. Bussell, 171 N.C. 474, 88 S.E. 484, 487 (1916). Therefore, to the extent that Tray Thomas was acting outside the scope of his actual and apparent authority, his knowledge will not be imputed to NCVA.

The knowledge of an agent also will not be imputed to his principal when he is acting in his own interest, has a motive for concealing the knowledge from his principal, or when he participates in fraud. See Sparks v. Union Tr. Co. of Shelby, 256

40

N.C. 476, 482, 124 S.E.2d 365, 368 (1962) (finding that a bank is not chargeable with the knowledge of its agent when the agent was engaged in independent, fraudulent, and ultra vires transactions which were not part of the bank's lawful business and were not in the bank's interests, and citing Fed. Reserve Bank of Richmond, Va. V. Duffy, 210 N.C. 598, 188 S.E. 82 (1936)). These limitations have been long recognized under North Carolina law.

> If the agent is so circumstanced as to make it his interest to withold [sic] information from his employer, then the rule that notice to him is notice to his principal, or the doctrine of imputed knowledge, does not apply. Stanford v. Grocery Co., 143 N.C. 419, 44 S.E. 815, and Tiffany on Agency, 262, 263, where it is said: 'The principal is not bound by the knowledge of his agent when it would be against the agent's interest to inform him of the facts. Therefore, if the agent is engaged in perpetrating an independent fraud on his own account, knowledge of facts relating to the fraud will not be imputed to the principal.

Wilson Lumber & Milling v. Atkinson, 162 N.C. 298, 78 S.E. 212, 215 (1913). Tray Thomas perpetrated a fraud and had every reason to hide it from everyone, including NCVA and Ronnie Thomas, whom he also defrauded individually. See Fidelity's Br. § II.B.2, at 22 ("Tray Thomas was a skilled thief and con-man. He fooled his father, his father's company, his father's company's customers, NCVA's long-term accountant, Dealers Assurance, Wachovia Bank and U.S. Bank, all in respect to the same scheme, and all before Fidelity came on the scene."). Therefore, to the extent that Fidelity and Dealers seek summary judgment based on the knowledge

41

or authority of Tray Thomas, the Motions for Summary Judgment will be denied.

## Fidelity's Motion for Summary Judgment

### I.   Causation

The element of causation for tortious conduct in North Carolina[31] addresses whether a defendant's action or failure to act actually and proximately caused damage to the plaintiff. Lamm v. Bissette Realty, Inc., 327 N.C. 412, 416, 395 S.E.2d 112, 115 (1990) ("[T]o survive defendants' motion for summary judgment in the present case, plaintiff must allege a prima facie case of negligence-defendants owed plaintiff a duty of care, defendants' conduct breached that duty, the breach was the actual and proximate cause of plaintiff's injury, and damages resulted from the

---

[31] The contractual claims in this case are governed by Ohio law.  Under Ohio law, the elements of causation for a breach of contract claim are substantially similar to North Carolina law regarding proximate cause for tortious conduct. See Claris, Ltd. v. Hotel Dev. Servs., LLC, 2018-Ohio-2602, ¶ 29 ("To prevail in the case at bar, [plaintiff] had to prove that one or more breaches of the construction contract proximately caused the water damage . . . ."); Scheffer v. Taylor, 2012-Ohio-1309, ¶ 9 (affirming the trial court's finding that defendant's breach of contract due to insufficient repairs proximately caused damage to plaintiff's motorcycle).  Specifically, as described by the Ohio Supreme Court, a defendant may be held liable for a breach of contract where the resulting injury arose as a natural consequence of the breach and was an injury anticipated by the parties to the contract should the contract be breached.  Midvale Coal Co. v. Cardox Corp., 157 Ohio St. 526, 530-531, 106 N.E.2d 556, 559 (1952) ("This court unanimously concurs in the foregoing [causation analysis] . . . because the[ damages] 'were such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it.'" (citation omitted)).  In this case, the issue—whether damages caused by theft were reasonably foreseeable if the trustee breached his contractual custodial obligations—is substantially similar to the issue of actual and proximate cause under North Carolina tort law, and a separate discussion is unwarranted at the summary judgment stage.  The Court will not address any potential differences that are immaterial for purposes of the analysis herein.

injury."); State v. Lane, 115 N.C. App. 25, 28, 444 S.E.2d 233, 235 (1994) ("The State must prove that defendant's action was both the cause-in-fact (actual cause) and the proximate cause (legal cause) of the victim's death to satisfy the causation element."); cf. Ratliff v. Duke Power Co., 268 N.C. 605, 614, 151 S.E.2d 641, 648 (1966) (discussing the difference between actual and proximate cause); see also Charles E. Daye & Mark W. Morris, North Carolina Law of Torts § 16.80 (2017) ("[North Carolina courts have] not been careful to separate the question of cause in fact from the broader concern of marking the extent of liability, which is the essence of proximate cause.").  Causation is an inference of fact drawn from other facts and circumstances, and is a determination ordinarily left for the jury.  Turner v. Duke Univ., 325 N.C. 152, 162, 381 S.E.2d 706, 712 (1989).  Actual cause is "a cause without which the second event would not have taken place."  Barefoot v. Joyner, 270 N.C. 388, 394-95, 154 S.E.2d 543, 548 (1967).  Legal or proximate cause, in addition to being a cause "without which [the second event] would not have occurred," is "a cause that produced the result in continuous sequence . . . and one from which any [person] of ordinary prudence could have foreseen that such a result was probable under all the facts as they existed."  Ward v. Carmona, 368 N.C. 35, 770 S.E.2d 70, 72 (2015).

### A.    Actual Cause

As an initial matter, Fidelity inappropriately limits NCVA's asserted injury.  Fidelity assumes that "[c]ause in fact in this case is a simple matter of timing.  Alleged misconduct of a defendant cannot be the cause in fact of loss when the loss occurs years before the conduct."  Fidelity's Br. § II.2.B.1; Fidelity's Reply 7 ("Whether due to the actions of Tray Thomas, NCVA, Dealers Assurance, Interactive Brokers, or U.S. Bank, or any combination of them, the trust funds were lost and the damage done long before Fidelity Bank became the purported trustee.").  The record before the Court is insufficient to determine the full damage to Plaintiff resulting from Fidelity's breaches of its obligations.  Nevertheless, over $200,000 remained in the Interactive Brokerage account when Fidelity obligated itself to take possession of all trust funds as trustee.  Further, NCVA continued to sell warranties from 2009 until 2012, believing that it was remitting the required reserve amounts to Fidelity's custody, and relying on the insurance provided by Dealers as required by state law and on the custodial services of Fidelity as trustee of the Trust Funds, for which Plaintiff paid fees to Fidelity.  Under these facts, NCVA's injury continued and grew after Fidelity became trustee.

Construing the facts in a light most favorable to the nonmoving party, Fidelity repeatedly breached duties owed to Dealers and Plaintiff by not taking custody of the Trust Funds as

required by the Trust Agreement and state law, failing to disclose this fact, and specifically representing that it had custody of the Trust Funds among other breaches.  Fidelity's breaches and failures actually caused Plaintiff to lose funds that were required to be, and should have been, entrusted from 2009 until 2012.  Had Fidelity performed its due diligence in establishing the Trust Account by assuming the role of trustee and taking control of the remaining Trust Funds as agreed, there would have been no opportunity for Tray Thomas to abscond with those funds, which was the primary purpose of having the funds put in trust in the first place.

Similarly, had Fidelity furnished accurate information that the Trust Funds did not exist and Fidelity did not have control over the Trust Account, NCVA could have stopped the ongoing loss of revenues it believed were being placed in trust.  Instead, Fidelity continued to represent to Dealers both the existence and its possession of the funds (and failed to disclose to NCVA otherwise), even after Perry conceded in writing that Fidelity could not "independently verify" the existence of Plaintiff's Trust Funds in December of 2011, two years after Fidelity assumed the role of trustee.  In fact, four months later, Fidelity certified the availability of $4,327,974.21 as "[s]ecurities held by [Fidelity] for [Dealers'] account."  Dep. Ex. 338.

The Wisconsin Supreme Court held a fiduciary liable for breaching its duties in an analogous case.  In that case,

> [Wells Fargo Bank,] during its tenure as trustee, . . . became aware of a defect in a trust that it had not drafted. It did not reveal that defect to the grantor . . . . After [the grantor]'s death, the trust was subject to increased tax liability due to the drafting defect. [Plaintiff] sued Wells Fargo on behalf of [the grantor]'s estate, alleging several theories of liability. The circuit court concluded that Wells Fargo breached a duty to [the grantor], and the court of appeals affirmed.

Hatleberg v. Norwest Bank Wisconsin, 2005 WI 109, ¶ 2, 283 Wis. 2d 234, 240, 700 N.W.2d 15, 18.  Wells Fargo "argue[d] that even if it did have a duty to disclose the [material] information . . . , it adequately satisfied its obligation by disclosing the information to the trust drafter . . . ." Id. ¶ 30, 700 N.W.2d at 24.  Wells Fargo understood the trust drafter to be the grantor's agent, which the parties disputed.  Id.

The court did not determine the agency issue.  Id. ¶ 34, 700 N.W.2d at 25 ("Even if we accept, arguendo, Wells Fargo's arguments that its notice to [the alleged agent] constituted notice to [the grantor], we still must address the fact that [the trustee] continued to advise [the grantor] to contribute money to the trust to save estate taxes after [the trustee] knew the trust was defective.").  The court noted

> Wells Fargo's potential duty under various theories: its duty as trustee, its duty as financial planner or advisor, and its duty under the Restatement (Second) of Torts to avoid negligent misrepresentations. Under any

46

> of these theories, Wells Fargo had a duty to ensure that
> the information it actually provided to [the grantor]
> was correct. Wells Fargo breached that duty by failing
> to exercise ordinary care; it told [the grantor] to
> continue contributing to the trust even though it knew
> the trust was defective for her objective.

Id. ¶ 41, 700 N.W.2d at 26.

> On the issue of causation, the court held that

> both the causal link and resulting injury are clear;
> [the grantor]'s estate paid increased taxes due to Wells
> Fargo's failure to inform her of the deficiencies. Had
> it told her of the problem, [the grantor] could have
> remedied it in part by giving the beneficiaries a present
> interest in future gifts or by setting up a new trust.

Id. ¶ 41, 700 N.W.2d at 26. As in Hatleberg, a reasonable jury

could find that Fidelity's failure to take possession and custody

of the remaining trust funds and ongoing revenue stream, while

continuing to represent that it had done so (or failing to disclose

that it had not done so) actually caused NCVA damages from 2009

through 2012. Therefore, the Court will deny the motion for

summary judgment based on actual cause.

### B. Proximate Cause

Liability may not be established solely on breach of a duty

accompanied by actual cause of injury; there also must be a showing

of proximate cause. King v. Allred, 209 N.C. 113, 117, 305 S.E.2d

554, 557 (1983). The Supreme Court of North Carolina has described

proximate cause as:

> [A] cause which in natural and continuous sequence,
> unbroken by any new and independent cause, produced the
> plaintiff's injuries, and without which the injuries
> would not have occurred, and one from which a person of

47

> ordinary prudence could have reasonably foreseen that
> such a result . . . was probable under all the facts as
> they existed.

Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 233, 311
S.E.2d 559, 565 (1984).  The foreseeability of the plaintiff's
injury, the presence of any intervening causes, and whether the
cause was a substantial factor in bringing about the injury are
all important considerations in the determination of proximate
cause.  Williamson v. Liptzin, 141 N.C. App. 1, 11, 539 S.E.2d
313, 319-20 (2000) (quoting Wyatt v. Gilmore, 57 N.C. App. 57, 59,
290 S.E.2d 790, 791 (1982)).

> 'It is only in exceptional cases, in which reasonable
> minds cannot differ as to the foreseeability of injury,
> that a court should decide proximate cause as a matter
> of law.  Proximate cause is ordinarily a question of
> fact for the jury, to be solved by the exercise of good
> common sense in consideration of the evidence of each
> particular case.'

Holt v. N.C. Dept. of Transp., 245 N.C. App. 167, 181, 781 S.E.2d
697, 706 (2016) (quoting Gaines ex rel. Hancox v. Cumberland Cty.
Hosp. Syst., Inc., 203 N.C. App. 213, 219, 692 S.E.2d 119, 122
(2010)).

Whether a defendant, exercising ordinary prudence, should
have foreseen the plaintiff's injury is a question of
reasonableness.  See Adams v. Mills, 312 N.C. 181, 193, 322 S.E.2d
164, 172 (1984).  The test of foreseeability does not require the
actor to have foreseen the exact manner in which the injury
occurred, but instead asks whether the risk of the injury was

48

within the reasonable foresight of the defendant.  Id.; Martishius v. Carolco Studios, Inc., 355 N.C. 465, 479, 562 S.E.2d 887, 896 (2002).

Fidelity's central contention is that Tray's intentional fraud was both unforeseeable and the sole proximate cause of any injury to NCVA.  Fidelity argues that "the intentional misconduct on the part of a third party is, as a matter of law, unforeseeable when determining the proximate cause of a loss."  Fidelity's Br. § II.B.2.  Specifically, Fidelity contends that Tray Thomas's acts constitute such a new and independent cause as to "prevent the alleged acts and omissions of Fidelity from being the proximate cause of NCVA's loss."  Id.  Accordingly, any loss to Plaintiff was a natural consequence of Tray Thomas's acts—acts that were unforeseeable to Fidelity—meaning that Fidelity's acts or omissions cannot be the proximate cause of Plaintiff's loss.  Id.

The Court disagrees.  Construing the record in a light most favorable to the Plaintiff, a reasonable fact-finder could conclude that Fidelity's failure to take possession of both the funds remaining at Interactive Brokers and the funds generated thereafter, its representation of the existence—and its possession—of the Trust Funds, and its failure to disclose suspected fraudulent activity, among any other breaches and failures, actually and proximately caused injury to Plaintiff.

Though "[a]n essential element of proximate cause is that the harm be foreseeable[,]" S. Watch Supply Co. v. Regal Chrysler-Plymouth, Inc., 69 N.C. App. 164, 316 S.E.2d 318, disc. rev. denied, 312 N.C. 496, 322 S.E.2d. 560 (1984), intentional misconduct on the part of a third party is not, as a matter of law, unforeseeable. "Under certain circumstances, another act, unassociated with the defendant's initial negligence, will occur contemporaneously with, or shortly after the defendant's negligence, with both acts being a cause-in-fact of a single injury to the plaintiff. If the intervening act is sufficiently independent, the defendant may be insulated from liability." David A. Logan & Wayne A. Logan, North Carolina Torts 192 (2nd ed. 2004).

In assessing proximate cause, the critical inquiry is not the degree of intentionality of the act, but whether the intervening act was foreseeable. As explained by the North Carolina Supreme Court,

> "An efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted. . . . If, however, the intervening responsible cause be of such a nature that it would be unreasonable to expect a prudent [person] to anticipate its happening, [the defendant] will not be responsible for damage resulting solely from the intervention. The intervening cause may be culpable, intentional, or merely negligent."

Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 236-37, 311 S.E.2d 559, 566-67 (1984) (emphasis added) (quoting Harton v. Tel. Co., 141 N.C. 455, 462-63, 54 S.E. 299, 301-02 (1906)). Therefore, even where there is an intervening intentional act by a third party, "[if] a defendant should have foreseen the risk of harm to the plaintiff posed by the negligent, reckless, or intentional activity of a third party, the defendant can be liable for having created the opportunity for the third-party conduct." Logan & Logan, supra, at 193 (citing Restatement (Second) of Torts § 302A; S. Watch Supply; Brown & Williamson Tobacco Corp. v. CSX Transp., Inc., 882 F. Supp. 511 (E.D.N.C. 1995)). In this case, the custodial obligations of the Trust Agreement were central to the purpose of the agreement, an agreement designed to prevent loss of the assets. See Dep. Ex. 26 (email from Borchardt to Ratchford, stating, "When we place the fund [sic] in the hands of an institutional trustee, we gain the comfort of knowing that the trust funds are protected."). Based on this, a reasonable jury could determine that defalcation in the absence of such custody was entirely foreseeable.

The case of Southern Watch Supply is analogous. 69 N.C. App. 164, 316 S.E.2d 318, disc. rev. denied, 312 N.C. 496, 322 S.E.2d. 560 (1984). There, a traveling wholesale seller and distributor of jewelry purchased a car from defendant Regal Chrysler-Plymouth. 69 N.C. App. at 164, 316 S.E.2d at 318. At the request of a

caller, and without the authority of the car owner, defendant's bookkeeper divulged the serial numbers for the keys to the car owner's vehicle. Id. at 164-65, 316 S.E.2d at 318-19. The following day,

> four cases of sample jewelry worth over $59,000 were stolen from [the car owner]'s automobile while he was calling on a customer . . . . A police investigation stated that the vehicle's trunk was opened with a key or similar device. The trunk was not pried open nor was the trunk lock broken.

Id. at 165, 316 S.E.2d at 319. In the court's opinion,

> a reasonably prudent dealer would know that with the correct serial numbers keys can be duplicated.

> Taken in the light most favorable to plaintiff, th[e] evidence present[ed] a genuine issue of material fact as to whether defendant's negligence proximately caused the loss of the jewelry. Certainly, it is reasonably foreseeable that the unauthorized act of giving the serial numbers to the caller could have been the cause of the theft.

Id. at 166-67, 316 S.E.2d at 320.

Similarly, a jury could find in this case that a reasonably prudent trustee would know that failing to provide custodial services of a trust's funds could cause a theft of those funds, and, as set forth above, Fidelity was aware of sufficient facts that a reasonable jury could find that it suspected that was exactly what was occurring. Yet Fidelity, as trustee, repeatedly failed to address the mounting evidence of fraud resulting from its failure to act as custodian of the Trust Funds. Instead, Perry emailed Tray Thomas reciting concerns of fraudulent activity

without disclosing these concerns to NCVA or to Dealers. See Dep. Exs. 332, 333, 357, 358. Even these emails to Tray Thomas did not begin until 2011, more than two years after Fidelity assumed its role as trustee. From this record, a reasonable fact finder could conclude that Fidelity created the opportunity for Tray Thomas's conduct, a risk of harm to NCVA that Fidelity should have foreseen.[32]

Fidelity's reliance on Staton v. Brame, 2001 NCBC 5, 2001 WL 34000153 (N.C. Super. Ct. Forsyth County May 31, 2001), stretches Judge Tennille's rationale in that case beyond the breaking point. In Staton, a brother ("Philip"), sister ("Inge"), and stepmother ("Mercedes") from Colombia inherited stock in a bottling company which they sold for approximately $120 million. Philip's brother-in-law, a former Forsyth County deputy sheriff ("Brame"), assured the family that he could provide for the family's security and financial investments. With this assurance, the family executed various powers of attorney and agreements directly and indirectly appointing Brame as their agent and attorney in fact and delegating Brame to handle specific areas of their affairs. Id. at 7-17, 2001 WL 34000153, at *2-4. Philip acted as the family's agent in the sale of the stock pursuant to an Appointment of Sellers' Agent.

---

[32] As conceded by Perry in his August 11, 2011 email, upon learning of the same facts of which Perry had been aware since the inception of the Trust Agreement, Fidelity's consultants immediately surmised that they "are being used as a fraudulent conduit . . . ." Dep. Ex. 332.

Id. at 14-15, 2001 WL 34000153, at *3.  Pursuant to his authority as sellers' agent, Philip had all of the proceeds of the stock sale wired into a deposit account at Centura Bank over which only Brame and his wife had signature authority.  Id. at 17-20, 2001 WL 34000153, at *4.  The account was a simple deposit account and, although Brame identified the Statons as the owners of the account to Centura, the account was not a trust account and Centura did not act as a trustee.  Id.  Thereafter, Brame lost substantial portions of the funds, defalcated portions to his personal benefit, and used the funds to establish a charitable foundation, which, in turn, partially funded five charitable lead trusts ("CLTs").  Id. at 29-65, 2001 WL 34000153, at *5-10.  The CLTs were established to fund a pain management clinic ("PIPM") for a doctor who had treated Brame, and PIPM entered a funding contract with the foundation.  Id.  Centura's trust department helped establish the foundation and the CLTs.  Id.  Nevertheless, the Statons did not authorize Brame to establish the foundation, fund the CLTs, or fund PIPM.  Id.  Upon discovery of the foundation and the CLTs, Inge and Mercedes terminated the foundation (thereby terminating funding to PIPM), contending that the various appointments and powers of attorney did not authorize the establishment of the foundation.  Id.  The doctors and PIPM thereafter entered a settlement agreement in which they released the foundation and the Statons from all claims.  Id.  The doctors thereafter sued Centura.

The court observed that Centura could "possibly" have been held responsible to PIPM for two actions: (1) failing to contact the Statons in connection with the establishment of the CLTs and foundation; and (2) failing to see that Inge properly executed the requisite power of attorney.  Id. at 108, 2001 WL 34000153, at *19.  The court concluded that this failure to disclose the existence of the properly executed power of attorney did not actually or proximately[33] cause the loss in funding to PIPM because "[k]nowledge of the existence of the [power of attorney] would not have affected the outcome of the termination of the [funding]." Id. at 110-14, 2001 WL 34000153, at *19-20.  Rather, it was the lack of authority itself that caused the funding to be terminated. Id.  The court, however, specifically observed that Centura's actions could have caused damages due to the doctor's reliance on the validity of the funding, but those claims were released in the settlement agreement.  Id.

Nothing in Staton supports the position that Fidelity's breaches of its fiduciary and contractual obligations to take and maintain custody and control of the trust assets as required by the Trust Agreement did not actually or proximately cause damages in this case, and, for the reasons set forth above, there is

---

[33] The court in Staton did not distinguish between actual and proximate cause in its analysis.  Although the court refers to "proximate" cause, its discussion is more appropriately understood as a determination that Centura's actions were not the cause in fact of the loss of funding.

sufficient evidence in the record from which a trier of fact could conclude that there was the requisite causation. Therefore, Fidelity's motion for summary judgment based on causation will be denied.

## II.  Impossibility of Performance

Fidelity contends that it is entitled to summary judgment on Plaintiff's claim for breach of contract under the doctrine of impossibility of performance. In support of this affirmative defense, Fidelity asserts that it was unable to perform under the contract because the funds were "lost or stolen years before Fidelity became trustee" and "the loss of the funds happened through no fault of Fidelity." Fidelity Br. § II.C.

As Fidelity concedes, contractual impossibility is closely related to the concept of causation. Id. Under Ohio law,[34] "[i]mpossibility of performance occurs where, after the contract is entered into, an unforeseen event arises rendering impossible the performance of one of the contracting parties." Mitchell v. Thompson, 2007 WL 2897752, 2007-Ohio-5362 (Ohio App. Oct. 1, 2007). Impossibility of performance is an affirmative defense that applies "only in those cases where performance has been rendered impossible without [the defendant's] fault and when the

---

[34] The contract claims in this case are governed by Ohio law. See Dep. Ex. 1, ¶ 28; Dep. Exs. 4, 5, § 12. The parties agree that North Carolina law governs the non-contractual claims. See Fidelity Brief § II.B n.1.

difficulties could not have reasonably been foreseen." Truetried Serv. Co. v. Hager, 118 Ohio App.3d 78, 87, 691 N.E.2d 1112, 1118 (1997) (quoting London & Lancashire Indemn. Co. of Am. V. Bd. of Comm. of Columbiana Cty., 107 Ohio St. 51, 64, 140 N.E. 672, 676(1923)). The affirmative defense admits the claim, but asserts a defense to liability despite the viability of the underlying claim. See Cleveland Constr. V. Kent St. Univ., 2012 WL 4019530, at *5, 2012-Ohio-4173, ¶ 25 (Ohio Ct. App. 2012). As with any affirmative defense, the burden of proof is on Fidelity to establish the elements of the defense. See, e.g., Eckroate v. Bauders, 41 Ohio App. 361, 365, 180 N.E. 76, 77 (1931).

As set forth above, a reasonable jury could find that Fidelity was not without fault, and that the loss of the additional funds, which Fidelity should have taken into custody from and after November 30, 2009, was foreseeable. Specifically, and without limitation to any damages arising from Fidelity's failure to take possession of funds generated on and after its execution of the Trust Agreement, Fidelity argues that Plaintiff has not come forward with sufficient evidence of the steps NCVA could have taken to recover the funds remaining at Interactive Brokers at the time Fidelity initially agreed to take possession of the trust assets if Fidelity had not misrepresented that it possessed the funds. See, e.g., Fidelity's Br. ¶ 64. On the contrary, to the extent that Fidelity breached its contractual obligation to take

possession of those funds and appropriately and timely has raised the affirmative defense of impossibility, the burden of proof at trial will be on Fidelity to demonstrate that, through no fault of its own, it could not have taken possession of the remaining funds and that the impossibility of taking possession of any of the putative Trust Funds was unforeseeable at the time it executed the agreement. Therefore, the Court will deny summary judgment based on impossibility of performance.

## III. Economic Loss Rule

Relying on this Court's prior dismissal of the extra-contractual claims against Dealers under the economic loss rule, Fidelity argues that "the purported trust agreement defines Fidelity's duties, and the limitations upon its duties, and it expressly states that Fidelity has no duties beyond those stated in the contract. As such, all other causes of action should be dismissed." Fidelity's Br. § II.D, at 25. As this Court noted in its prior opinion, Dealers owed no fiduciary or other extra-contractual duties to NCVA under the Insurance Agreement or due to a special relationship of trust and confidence, and Plaintiff did not assert any actions by Dealers that breached a legal duty other than those which Dealers owed under the agreement. NC & VA Warranty Co., Inc. v. Fidelity Bank, 554 B.R. 110, 125-26 (Bankr. M.D.N.C. 2016).

In contrast, the gravamen of Plaintiff's claims against Fidelity do not arise solely from those duties set forth in the contract. As a trustee and fiduciary,[35] Fidelity was saddled with additional, extra-contractual duties, including a duty of loyalty; see Wachovia Bank & Tr. Co. v. Johnston, 269 N.C. 701, 711, 153 S.E.2d 449, 457 (1967) ("It is universally recognized that one of the most fundamental duties of the trustee throughout the trust relationship is to maintain complete loyalty to the interests of his [c]estui que trust."); "a duty to disclose all material facts[,]" Harris v. Testar, Inc., 243 N.C. App. 33, 38, 777 S.E.2d 776, 780 (2015) (quoting Vail v. Vail, 233 N.C. 109, 114, 63 S.E.2d 202, 206 (1951) ("Where a relation of trust and confidence exists between the parties, 'there is a duty to disclose all material facts, and failure to do so constitutes fraud.'")), see Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 196 (M.D.N.C. 1997) ("Under the North Carolina law which governs this case, in order for silence or an omission by the defendants to be actionable fraud, it must relate to a material matter known by the defendants which they had a legal duty to communicate to plaintiff, 'whether that duty arose from a relation of trust, from confidence, inequality of condition or knowledge, or other attendant circumstances.'

---

[35] In North Carolina, "a breach of fiduciary duty is a species of negligence or professional malpractice." Farndale Co., LLC v. Gibellini, 176 N.C. App. 60, 68, 628 S.E.2d 15, 20 (2006) (internal quotations omitted).

Setzer v. Old Republic Life Ins. Co., 257 N.C. 396, 399, 126 S.E.2d 135, 137 (1962).  Generally such legal duty to disclose will arise where a fiduciary relationship exists between the parties."); and a duty to "take control of and protect the trust property."  See N.C. Gen. Stat. § 36C-8-809 (2006).

Construing the record in a light most favorable to Plaintiff, Fidelity not only failed to take custody of the Trust Funds and reserves as required by the contract and statute, but Fidelity also repeatedly failed to disclose that it had not done so despite having sufficient information that a reasonable banker could (and did) come to the conclusion that the bank likely was being used as a conduit for fraud, and it charged NCVA fees for which it provided no services.  The economic loss rule "does not bar tort claims based on an independent legal duty, which is '"identifiable" and "distinct"' from the contractual duty."  Legacy Data Access, Inc. v. Cadrillion, LLC, 889 F.3d 158, 166 (4th Cir. 2018) (noting that tort claims will survive where the defendant takes on an independent duty such as a bailee, even where the property also is the subject of a contract) (citing Ports Authority, 294 N.C. at 81-82, 240 S.E.2d at 350-51); Ambac Ass. Corp. v. U.S. Bank Ass'n, --- F.Supp.3d ---, 2018 WL 3212456 (S.D.N.Y. 2018); see also Mark A. Olthoff, Insurance Law Annual: If You Don't Know Where You're Going, You'll End Up Somewhere Else; Applicability of the Comparative Fault Principles in Purely Economic Loss Cases, 49

Drake L. Rev. 589, 604 (2001) ("The economic loss doctrine . . . does not preclude an action for trust losses due to a breach of fiduciary duty or breach of trust by one in a special position, for example, a trustee.").  The economic loss rule simply does not prevent tortious claims against a fiduciary for breach of its extra-contractual duties, even in the face of a written trust agreement, and none of the cases cited by Fidelity stand for such a proposition.  See S. Atlantic Ltd. P'ship of Tenn. L.P. v. Riese, 284 F.3d 518 (4th Cir. 2002) (recognizing that the existence of a fiduciary relationship between contracting parties would remove claims from the general rule applied in its case that contracting commercial parties owe no duty in tort to counter-parties); Kaleel Builders, Inc. v. Ashby, 161 N.C. App. 34, 587 S.E.2d 470 (2003) (generally stating economic loss doctrine as applying to normal commercial contracting parties—in this case, a contractor and subcontractor—between whom no special relationship exists); Spillman v. Am. Homes of Mocksville, Inc., 108 N.C. App. 63, 422 S.E. 2d 740 (1992) (same, buyer and purchaser of mobile home). Therefore, the Court will deny Fidelity's motion based on the economic loss rule.[36]

---

[36] The economic loss rule does not apply to Plaintiff's claims for fraud.  See Prassas Capital, LLC v. Blue Sphere Corp., Case No. 3:17-CV-131 RJC-DCK, 2018 WL 1567362, at *5 (W.D.N.C. Mar. 30, 2018).

## IV.  Actual and Justifiable Reliance

Fidelity contends that NCVA did not actually or justifiably rely on Fidelity's misrepresentations and omissions because: (1) the statements that it held the trust funds were sent only to Dealers and its auditors, and therefore, NCVA could not have relied on those statements; (2) there is no evidence that NCVA relied on the misrepresentations because Ronnie Thomas is dead and cannot testify as to what he would have done to recover the remaining funds in the Interactive Brokers account at the inception of the Trust Agreement; and (3) because Tray Thomas, as NCVA's agent, was aware of the facts, and "[a] party cannot be deceived as to a material fact of which it is already aware."  Fidelity's Br. § II.F.  The Court has already addressed the issue of Tray Thomas's imputed knowledge above and need not recapitulate that discussion here.   The remaining two bases similarly are insufficient to support summary judgment with respect to Fidelity's omissions and its representation that it had received the original funds as reflected in EXHIBIT A to Dep. Ex. 4.  Ronnie Thomas's signature appears on Dep. Ex. 4 and there is sufficient evidence in the record from which a reasonable jury could conclude that NCVA relied on that assurance.   Nevertheless, Plaintiff may not rely on the audit statements to support a claim for fraud because there is no evidence that NCVA directly relied on those statements.  Fidelity provided the false custodial statements to Dealers and its auditors

and not directly to NCVA, and there is no evidence in the record that the statements in the audit confirmations were repeated to NCVA by Dealers.

Actual and justifiable reliance are questions for the jury, "unless the facts are so clear that they support only one conclusion." Choplin v. Int'l Bus. Mach. Corp., Case No. 1:16CV1412, 2017 WL 3822044, at *7 (M.D.N.C. 2017) (quoting Comer v. Person Auto Sales, Inc., 368 F. Supp.2d 478, 486 (M.D.N.C. 2005)).  Even construing the record in a light most favorable to the Plaintiff, the fact that the false account statements were provided only to Dealers' auditors, combined with the absence of any evidence in the record submitted to the Court by the Plaintiff that these false statements were repeated to NCVA, defeats any claim of actual reliance on those statements.

In North Carolina, a showing of justifiable reliance requires that a plaintiff demonstrate that it actually and directly relied on allegedly false statements.  See Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 205, 367 S.E.2d 609, 612 (1988) ("We conclude that a party cannot show justifiable reliance on information contained in audited financial statements without showing that [the party] relied upon the actual financial statements themselves to obtain this information."); Arnesen v. Rivers Edge Golf Club & Plantation, Inc., 368 N.C. 440, 781 S.E.2d 1 (2015) (affirming summary judgment where the record demonstrated

63

that the plaintiffs never saw the appraisal reports of which they complained, and the plaintiffs obligated themselves to the transactions at issue independent of, and prior to, the allegedly false statements in the appraisals); Fazzari v. Infinity Partners, LLC, 235 N.C. App. 233, 246, 762 S.E.2d 237, 245 (2014) (affirming summary judgment where the plaintiffs "cannot have relied on information they did not see and did not know existed . . . at the time of their decisions" (citation omitted)); Hernandez v. Coldwell Banker Sea Coast Realty, 223 N.C. App. 259, 735 S.E.2d 605, 614 (2012) ("reliance by proxy was rejected by Raritan"); Brinkman v. Barrett Kays & Assocs., 155 N.C. App. 738, 742, 575 S.E.2d 40, 44 (2003) ("[a]ctual reliance is direct reliance upon false information"); Abraham v. Jauregui, 2012 WL 2052691, at *6, 2012 NCBC 35, 43 (2012) ("The North Carolina Court of Appeals, consistent with Raritan, has held that a negligent misrepresentation claim cannot survive summary judgment where the plaintiffs can forecast only evidence of indirect, rather than direct, reliance.").[37]  Therefore, Plaintiff did not actually rely on the audit statements sent to Dealers.

---

[37] In each of these cases, the courts note the absence of any special relationship between the plaintiff(s) and defendant(s), and, therefore, the absence of any duty by the defendant to affirmatively disclose.  Fidelity, as a fiduciary, had a duty to disclose that it did not hold the funds in trust as required by the Trust Agreement and that it did not have access to the putative custodial account, among other material facts that were known to Fidelity and were sufficient to alert its auditors that the bank likely was being used as a "conduit for fraud."  Therefore, Plaintiff's fraud claim will survive at this

Construing the record in a light most favorable to Plaintiff, however, there is evidence that NCVA actually relied on Fidelity's representation that it had taken possession of the original trust funds and its failure to disclose that it did not hold the funds in trust and had no access to the putative account.  Fidelity, Dealers, and NCVA all were in direct privity with respect to the Trust Agreement and the information provided by and between the parties to that agreement.  In fact, the agreement purports to require statements only to be sent to NCVA "for" Dealers.  See Trust Agreement § 7.(e).  Borchardt specifically testified that Dealers would have acted if it had not been told that Fidelity had custody of the funds.  See Borchardt Dep. 207-08.  This testimony is consistent with the entire circumstances of the case and common sense.  As stated above, the central purpose of the Trust Agreement was to protect the reserve through custodial services.  To the extent that Fidelity failed to disclose its compliance with this central purpose—especially in light of the surrounding circumstances indicating fraud—it would be reasonable to conclude that NCVA relied on Fidelity's original assurance that it had taken possession of the Trust Funds and that both beneficiaries relied on its subsequent omissions.  Therefore, the Court will deny Fidelity's motion for summary judgment based on any argument that

stage based on Fidelity's omissions and with respect to any representation it made regarding taking custody of the original trust funds.

NCVA did not actually rely on Fidelity's original representation in Dep. Ex. 4 and its subsequent omissions.

## V.   Aiding and Abetting Conversion

In matters pending in federal courts in which state law controls, the federal courts apply two closely related but different precepts.  The first precept provides that, in such proceedings and where there is no controlling precedent from the state's highest court on the issue presented, the federal court "must . . . offer its best judgment about how [the] state's highest court would rule on [the] claims, giving appropriate weight to any opinions of [the] state's intermediate appellate courts." Anderson v. Sara Lee Corp., 508 F.3d 181, 190 (4th Cir. 2007) (citing Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 512 (4th Cir. 1999)).  The second precept, as previously recognized by this Court, provides that Federal courts should not recognize claims for relief based upon state law where those claims are previously unrecognized in the applicable state courts.  See, e.g., Gully Brook Revocable Tr. v. Cook (In re Cook), Case No. 15-81220, Adv. Pro. No. 16-09015, 2017 WL 532286, at *5 (Bankr. M.D.N.C. 2017) (dismissing a previously unrecognized claim for "false pretenses," and noting that "[i]t is well-recognized that when deciding a question of state law, federal courts must rule upon state law as it exists, and not surmise or suggest its expansion."

66

(quoting Breeden, 171 F.R.D. at 202-03 n.15, and citing Burris Chem., Inc. v. USX Corp., 10 F.3d 243 (4th Cir. 1993))).

These precepts are not contradictory and may be reconciled by understanding that federal courts should not expand state law to previously unrecognized claims for relief. Nevertheless, where state courts previously have recognized claims, although the recognition is unsettled, federal courts should not dismiss claims that are consistent with prior state rulings, but inconsistent with others, where the state's highest court has not spoken. Instead, the federal court must use its best judgment to anticipate the ruling of the state's highest court. Though "[f]ederal courts are to tread carefully when asked to extend state tort law to new scenarios[,]" such restraint does not require dismissal. See, e.g., Lee v. Certainteed Corp., 123 F. Supp. 3d 780, 799 (E.D.N.C. 2015) (analyzing an aiding and abetting claim unrecognized by the North Carolina Supreme Court by canvassing North Carolina Court of Appeals decisions applying and limiting liability for aiding and abetting or concert of action under the Restatement (Second) of Torts § 876 (1979)).

Claims for conversion are well recognized in North Carolina, and the Court need not consider the viability of the underlying tort in North Carolina. See, e.g., Eley v. Mid/East Accept. Corp. of N.C., Inc., 171 N.C. App. 368, 371-2, 614 S.E.2d 555, 559 (2005). Whether North Carolina recognizes a cause of action for

aiding and abetting a common law tort remains an open question, with conflicting opinions in both the North Carolina state and federal courts. See In re Am. Ambulette & Ambulance Serv., Inc., 560 B.R. 256, 265 (Bankr. E.D.N.C. 2016) ("Upon reviewing numerous decisions of North Carolina's Court of Appeals and Superior Courts, the resounding consensus is that whether North Carolina recognizes a claim for aiding and abetting breach of fiduciary duty is an open question—neither answered in the affirmative nor in the negative."); Duke Energy Int'l, L.L.C. v. Napoli, 748 F. Supp. 2d 656, 668-69 (S.D. Tex. 2010) ("This Court's own research reveals that whether North Carolina law recognizes this cause of action remains an open question."); Land v. Land, 222 N.C. App. 317, 729 S.E.2d 731 (2012) ("Recognition of a cause of action for aiding and abetting breach of fiduciary duty in North Carolina is an 'unclear' issue. In the present case, we find no reason to answer that question."), writ denied, rev. denied, 366 N.C. 565, 738 S.E.2d 366 (2013); Islet Scis., Inc. v. Brighthaven Ventures, LLC, No. 15 CVS 16388, 2017 WL 129944, at *5 (N.C. Super. Ct. Jan. 12, 2017) (describing how "North Carolina's appellate courts have not, to-date, expressly recognized a cause of action for aiding and abetting breach of fiduciary duty," and indicating that the existence of such a claim is "at best . . . 'unsettled.'") (quoting Corwin v. British Am. Tobacco PLC, 796 S.E.2d 324, 339 (N.C. Ct. App. 2016), rev. allowed, writ allowed, 369 N.C. 751, 799 S.E.2d

616 (2017)); New Friendship Used Clothing Collection, LLC v. Katz, No. 16 CVS 14819, 2017 WL 3601714, at *15 (N.C. Super. Aug. 18, 2017) ("Likewise, it is unsettled whether North Carolina recognizes a claim for aiding and abetting constructive fraud."). Contra Bell v. Kaplan, No. 3:14CV352, 2016 WL 815303, at *5 (W.D.N.C. Feb. 29, 2016) ("As North Carolina does not recognize [a claim for aiding and abetting breach of fiduciary duty], [the claim] must be dismissed."); Zloop, Inc. v. Parker Poe Adams & Bernstein, LLP, No. 17 CVS 5480, 2018 WL 943954, at *12 (N.C. Super. Feb. 16, 2018) ("The Court now concludes that on appeal the North Carolina Supreme Court will hold that North Carolina does not recognize a claim of aiding and abetting breach of fiduciary duty. Alternatively, for the reasons discussed below, the Court further finds that, should the North Carolina Supreme Court recognize such a claim, Zloop's Amended Complaint nevertheless fails because Zloop has not, as a matter of law, alleged the essential elements of any such claim.").

Despite this uncertainty surrounding whether aiding and abetting a common law tort is actionable in North Carolina, at least one North Carolina Court of Appeals opinion has recognized a claim for aiding and abetting breach of fiduciary duty, and adopted the definition for aiding and abetting a common law tort in the Restatement (Second) of Torts § 876 (1979). Blow v. Shaughnessy, 88 N.C. App. 484, 489, 364 S.E.2d 444, 447 (1988)

69

("First, we recognize that a cause of action for aiding and abetting in breach of fiduciary obligations has heretofore never been addressed by this Court. However, a cause of action on this theory has been recognized by federal courts in securities fraud cases based on violations of section 10(b) of the Securities Exchange Act of 1934 . . . ."); see also Greensboro Rubber Stamp Co. v. Se. Stamp & Sign, Inc., 212 N.C. App. 691, 718 S.E.2d 736 (2011) ("In Blow . . . , this Court, in recognizing the cause of action for aiding and abetting a breach of fiduciary duty, cited 'subsection (b), section 876, Restatement of Torts 2d' and stated that 'a person is liable for harm resulting to a third person if he [ ] knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'") (quoting Blow, 88 N.C. App. at 364).[38] Therefore, this Court must determine whether the Supreme Court of North Carolina would generally adopt the definition for aiding and

---

[38] The "underlying rationale" applied in Blow regarding a claim for aiding and abetting a violation of § 10(b) of the Securities Exchange Act of 1934 "was eliminated by the United States Supreme Court in Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S. Ct. 1439, 128 L.Ed.2d 119 (1994)." Laws v. Priority Tr. Servs. of N.C., 610 F. Supp. 2d 528, 532 (W.D.N.C. 2009), aff'd sub nom. Laws v. Priority Tr. Servs. of N.C., LLC, 375 F. App'x 345 (4th Cir. 2010); see Cent. Bank of Denver, 511 U.S. at 179 ("From the fact that Congress did not attach private aiding and abetting liability to any of the express causes of action in the securities Acts, we can infer that Congress likely would not have attached aiding and abetting liability to § 10(b) had it provided a private § 10(b) cause of action."). Although Central Bank overruled portions of Blow, "that part of the [Blow] decision noting the adoption of Section 876 has not been specifically overruled, and the [Blow] case provides some support for finding Section 876 to be the adopted law of North Carolina, at least in certain circumstances." Lee, 123 F. Supp. 3d at 798.

abetting liability under the Restatement.   This issue remains unsettled.   See In re Am. Ambulette & Ambulance Serv., Inc., 560 B.R. 256, 266 (Bankr. E.D.N.C. 2016); cf. Terry v. SunTrust Banks, Inc., 493 F. App'x 345, 356 n.9 (4th Cir. 2012) ("Because we conclude LES was not a fiduciary under Virginia law, we need not resolve SunTrust's alternative argument that Virginia does not recognize a cause of action of aiding and abetting a tort.").

There is some indication that the North Carolina Supreme Court will adopt the standard in the Restatement.  In Boykin v. Bennett, 253 N.C. 725, 118 S.E.2d 12 (1961), the North Carolina Supreme Court adopted the standard for aiding and abetting liability set forth in § 876 of an earlier version of the Restatement in a case involving joint tortfeasors.[39]   In that case, the court held that a defendant was liable for the death of a passenger in another vehicle where the defendant was street racing with the driver of the decedent's vehicle.  Id.  The court applied the standards for aiding and abetting liability in the Restatement, and held that the defendant was liable even though he was not driving the car in which the plaintiff was injured.  Id. at 731, 118 S.E.2d at 16. The North Carolina Supreme Court has not thereafter limited its adoption of the Restatement standard to joint tortfeasors, and

---

[39] Though the North Carolina Supreme Court relied on an earlier version of the Restatement (Second) of Torts, the quoted portion in Boykin does not materially differ from the more recent edition of the Restatement cited herein.  See Restatement (Second) of Torts § 876 (1979).

only the state's intermediate courts have surmised that the Supreme Court's adoption of the standard is limited to joint tortfeasors or other cases in which the defendant's conduct falls below an independent standard of care.  Given the North Carolina Supreme Court's adoption of the Restatement standard in <u>Boykin</u>, this Court is reluctant to cabin that holding based on rulings from the state's lower courts—especially for purposes of summary judgment—where the pronouncements from the state's lower courts have been inconsistent.

Even if the Court were inclined to agree with those courts that have anticipated that the North Carolina Supreme Court will cabin its previous adoption of the Restatement definition for aiding and abetting liability, it would not grant summary judgment in this case.  Construing the facts in a light most favorable to Plaintiff and for the reasons set forth herein, the record is sufficient such that a reasonable jury could find that Fidelity's conduct fell below an ordinary standard of care and rose to the level of culpability required by the lower courts that have limited the holding in <u>Boykin</u>.  In addition, as in <u>Boykin</u>, Fidelity's conduct may have breached a statutory standard of care under N.C. Gen. Stat. § 36C-8-809.  <u>See</u> <u>Hinson v. Jarvis</u>, 190 N.C. App. 607, 613, 660 S.E.2d 604, 608 (2008) (refusing to apply the holding in <u>Boykin</u> and its adoption of the restatement standard where the defendant's actions "did not fall below an ordinary standard of

care or involve an issue as to which person was the cause of the harm alleged"). Accordingly, the Motion for Summary Judgment as to Plaintiff's claim for aiding and abetting conversion will be denied.

## VI. Constructive Fraud

Fidelity contends that it is entitled to summary judgment with respect to its claim for constructive fraud because the record is devoid of any evidence of the consummation of a transaction as a result of its failure to disclose that it did not have custody of any trust funds and because it did not receive any benefit from the omissions. Fidelity's Br. § II.H. Plaintiff counters that Fidelity benefited by "continuing to collect Trustee fees until [Fidelity's] and Tray Thomas' fraud was exposed . . . . The benefit Fidelity received was in the form of fees which it did not earn, having failed completely to take possession of NCVA's funds . . . ." Plaintiff's Br. 23 (citing NationsBank of N.C., N.A. v. Parker, 140 N.C. App. 106, 113-14, 535 S.E.2d 597, 602 (2000)).

In Parker, the court held that "payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage in the transaction." 140 N.C. App. at 114, 535 S.E.2d at 602. The court stated further that, since "[t]here was no evidence that the amount paid defendant for notarizing and witnessing the loan documents would have been any different if the

documents had not been forged," the record was insufficient to withstand the defendant's motion for summary judgment. Id.; see also White v. Consolidated Planning, Inc., 166 N.C. App. 283, 295, 603 S.E.2d 147, 156 (2004) ("A plaintiff must allege that the benefit sought was more than a continued relationship with the plaintiff or payment of a fee to a defendant for work it actually performed." (emphasis added) (citing Sterner v. Penn, 159 N.C. App. 626, 632, 583 S.E.2d 670, 674 (2003)).

This Court does not read Sterner and its progeny as broadly as Fidelity's arguments suggest, and the record in this case contains sufficient evidence of an unearned benefit to Fidelity to support a claim for constructive fraud for purposes of summary judgment. As set forth herein, the central purpose of the Trust Agreement was for Fidelity to provide custodial services, services that Fidelity concedes it never provided. Moreover, the fees Fidelity charged to NCVA were based on the amount of funds it claimed were held in trust by the bank, but the bank charged these fees based on the amounts reflected in its shadow accounting— amounts that in fact were never held in custody by the bank at all. Willis Dep. 25-26, 180-82; Dep. Exs. 400, 404; Fidelity's Br. ¶¶ 52. Therefore, whatever amount charged was more than the amount that would have been charged ($0) if Fidelity had disclosed that it was holding no funds whatsoever. Under the circumstances of this case, Plaintiff has come forward with sufficient evidence

of a benefit to Fidelity to withstand summary judgment.  Cf. Loftin v. QA Invs. LLC, 2015 NCBC LEXIS 44, *23-24, 2015 NCBC 41 (2015) (refusing to apply the holding in Sterner beyond its terms, and denying motion to dismiss a constructive fraud claim where the fees received by the alleged fiduciary were received "after developing misgivings" and "for the purpose of participating in the overall profits of a potentially fraudulent scheme").

## VII. Conspiracy

Under North Carolina law, the elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme.  Privette v. Univ. of N.C. at Chapel Hill, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989).  There is no separate cause of action for civil conspiracy aside from the underlying unlawful act.  Dove v. Harvey, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005).  Rather, a claim for civil conspiracy is premised on the underlying unlawful act.  Harris v. Matthews, 361 N.C. 265, 276 n.2, 643 S.E.2d 566, 573 n.2 (2007); see also Shope v. Boyer, 268 N.C. 401, 405, 150 S.E.2d 771, 773-74 (1966) ("In civil conspiracy, recovery must be on the basis of sufficiently alleged wrongful overt acts.  The charge of conspiracy itself does nothing more than associate the defendants together . . . .").  North Carolina courts have found

that when summary judgment for a defendant on an underlying tort claim is proper, a claim for civil conspiracy based on that defective tort claim also must fail.  See, e.g., Strickland v. Hedrick, 194 N.C. App. 1, 19, 669 S.E.2d 61, 73 (2008); Esposito v. Talbert & Bright, Inc., 181 N.C. App. 742, 747, 641 S.E.2d 695, 698 (2007).  Nevertheless, where a claim for civil conspiracy is based on wrongful conduct or a viable tort claim against another person, and the facts support the other elements of conspiracy, the conspiracy claim will survive even if no other tort claims remain viable against the defendant.  See Chisum v. MacDonald, 2018 NCBC LEXIS 34, 2018 NCBC 33, 30-33 (2018).

Fidelity contends that any claim for conspiracy fails because it is derivative of the underlying tort claims for which it is entitled to summary judgment.  Fidelity's Br. § II.I.[40]  Having determined that summary judgment will be denied on the underlying tort claims, the Court similarly will deny the motion with respect to civil conspiracy.[41]

---

[40] Fidelity also contends that it could not have conspired with Tray Thomas to lose or steal the funds because "they were lost or stolen years before Fidelity became trustee."  Id.  This argument is without merit for the reasons set forth herein.

[41] Although not a defendant in this case, Tray Thomas committed torts against NCVA.  Construing the record in a light most favorable to Plaintiff, a reasonable jury could find that Fidelity was aware of the fraud, and Fidelity's failure to close the accounts for months after conceding in writing that the bank believed that it was being used as a conduit for fraud, while continuing to facilitate the ongoing deception and receive fees for services that it did not provide, establish a tacit agreement with Tray Thomas6.  See First Fin. Sav. Bank, Inc. v. Am. Bankers of Fla., Inc., Case No. 8-33-CIV-5-H, 1990 WL 302790, at *2-3 (Apr. 17, 1990) ("An agreement can be found 'if there is a meeting of the minds, a mutual implied understanding or tacit agreement, all the parties working

### Dealers' Motion for Summary Judgment

## I.   Breach of Contract

NCVA's sole remaining claim against Dealers is for breach of the Insurance and Trust Agreements.  Plaintiff contends that Dealers breached these contracts by removing "millions of dollars of NCVA's funds from the Trust Account at U.S. Bank . . . ."  Amended Compl. ¶ 8.

### A.   Equitable Estoppel

Although otherwise barred by the statute of limitations, this claim survived dismissal because Plaintiff alleged sufficient facts to support the application of equitable estoppel.  <u>See</u> Dismissal Op. 28-33.  Dealers asserts that the record at summary judgment fails to establish any of the elements of equitable estoppel, and that it would not be unjust for it to benefit from the statute of limitations.  Dealers' Br. 13-20.  In the alternative, Dealers asserts that the record does not demonstrate that it committed any breach of contract.  <u>Id.</u>  Finally, Dealers affirmatively moves for summary judgment on its counterclaim as set forth in Dealers Proof of Claim.  Plaintiff points out that

---

together, with a single design, for the accomplishment of the common purpose.'" (quoting 15A C.J.S. <i>Conspiracy</i>, § 40 at 735 (1967)) (citing <u>Halberstan v. Weich</u>, 705 F.2d 472, 477 (D.C. Cir. 1983)).  Such a tacit agreement can be inferred without direct testimony of a cohesive agreement between the parties, and the "conspiracy can be proven through the circumstantial evidence concerning the relations and conduct of the parties, the overt acts they committed, and the reasonable inferences that arise from these facts."  <u>Id.</u>  Construing the facts in a light most favorable to Plaintiff, the record is sufficient to support this claim for purposes of summary judgment.

Dealers settled with Fidelity, amended its claim, and Plaintiff is entitled to an accounting.

"[A] defendant may properly rely on a statute of limitations as a defensive shield against stale claims, but may be equitably estopped from using a statute of limitations as a sword, so as to unjustly benefit from its own conduct which induced a plaintiff to delay filing suit." Leciejewski v. S. Entm't Corp., No. 1:09-CV-995, 2011 WL 1458505, at *4 (M.D.N.C. Apr. 15, 2011) (quoting Friedland v. Gales, 509 S.E.2d 793, 796 (N.C. Ct. App. 1998)) (internal quotation marks omitted).

> [T]he essential elements of an equitable estoppel as related to the party estopped are: (1) [c]onduct which amounts to a false representation or concealment of material facts, or at least, which is reasonably calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party afterwards attempts to assert; (2) intention or expectation that such conduct shall be acted upon by the other party, or conduct which at least is calculated to induce a reasonably prudent person to believe such conduct was intended or expected to be relied and acted upon; (3) knowledge, actual or constructive, of the real facts. As related to the party claiming the estoppel, they are: (1) lack of knowledge and the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party sought to be estopped; and (3) action based thereon of such a character as to change his position prejudicially.

Id. (quoting Gore v. Myrtle/Mueller, 362 N.C.27, 34, 653 S.E.2d 400, 405 (2007)) (internal quotation marks omitted).

Dealers argues that none of the elements are met because: (1) Dealers did not know the transfers out of trust had occurred and

did not take any action to conceal the transfers; and (2) NCVA had actual and constructive knowledge of the transfers through its agent, Tray Thomas. Dealers' Br. 18-20. Again, the Court will not impute Tray Thomas's knowledge to NCVA for purposes of summary judgment. Moreover, as set forth above, the Court cannot conclude for purposes of summary judgment that Dealers was unaware that the trust funds had been transferred out of US Bank and not returned at the time that it executed the Trust Agreement with Fidelity and NCVA.[42] At that time, Dealers had reason to believe Tray Thomas was committing a fraud, and knew that there was no account at Interactive Brokers in the name of US Bank despite Tray Thomas's previous assurances to the contrary. In the face of this knowledge, Borchardt affirmatively decided to "play it out and see what Tray will do next." Dep. Ex. 32. At that time, Dealers knew that Tray Thomas already had lied to US Bank about the existence of a custodial account in the bank's name at Interactive Brokers. Thereafter, with no indication that the funds had been returned other than Fidelity's execution of the Trust Agreement itself and without any evidence of an affirmative inquiry to Fidelity or Interactive Brokers regarding the same, Dealers executed the Trust Agreement with the attached Exhibit A reflecting possession of over $3.4 million in assets. For the reasons set forth above, the

---

[42] See supra n. 7, 8, 30.

Court cannot conclude for purposes of summary judgment that Ronnie Thomas or NCVA had any knowledge of these facts.  Therefore, for reasons similar to those set forth in its prior Dismissal Opinion, the Court will deny Dealers' Motion for Summary Judgment based on the statute of limitations.[43]

## B.   Dealers Proof of Claim and Counterclaims

Dealers' counterclaims are asserted against the estate and have been consolidated in this adversary proceeding with its proof of claim.[44]  Therefore, the Court will consider the claims within the rubric established by the Fourth Circuit under 11 U.S.C. § 502.  As explained by the Fourth Circuit:

> The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim. The creditor's filing of a proof of claim constitutes prima facie evidence of the amount and validity of the claim.  11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). The burden then shifts to the debtor to object to the claim.  11 U.S.C. § 502(b); Finnman, 960 F.2d at 404. The debtor must introduce evidence to rebut the claim's presumptive validity.  Fed. R. Bankr. P. 9017; Fed. R.

---

[43] Even if the record construed in a light most favorable to Plaintiff did not support equitable estoppel, the Court would not grant summary judgment for purposes of recoupment as a defense to Dealer's Proof of Claim for the reasons set forth in Mikels v. Unique Tool & Mfg. Co., Inc., No. 5:06CV32, 2007 WL 4284727, at *23-26 (E.D.N.C. Dec. 3, 2007).  See also Bull v. U.S., 295 U.S. 247, 262, 55 S. Ct. 695, 70001 (1935) ("[R]ecoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.").

[44] The Dealers Proof of Claim, as amended on September 23, 2016, asserts a claim in the amount of $764,081.95, reserving the right to further amend the claim as a result of any additional expenditures thereafter.  In support of its motion for summary judgment, Dealers filed the affidavit of Connie L. Holmes, Controller (ECF No. 186), asserting that Dealers has paid $831,750 as of August 31, 2017, and estimates additional payments of $50,000.  The affidavit was executed two months later, on October 23, 2017.  Neither the proof of claim, nor the Holmes Affidavit has been amended.

Evid. 301; 4 <u>Collier</u> at ¶ 501.02[3][d]. If the debtor
carries its burden, the creditor has the ultimate burden
of proving the amount and validity of the claim by a
preponderance    of    the    evidence.    <u>Id.</u>    at    ¶
502.02[3][f].").

<u>In re Harford Sands, Inc.</u>, 372 F.3d 637, 640-41 (4th Cir. 2004);

<u>see also</u> <u>In re Wright</u>, 438 B.R. 550, 552 (Bankr. M.D.N.C. 2010)

(determining that, once a valid proof of claim has been filed,

"the objector must produce evidence equal in force to the prima

facie case . . . which, if believed, would refute at least one of

the allegations that is essential to the claim's legal validity")

(citing <u>Hartford Sands</u> and <u>In re Allegheny Intn'l, Inc.</u>, 954 F.2d

167, 173-74 (3d Cir. 1992)).  Where the objector rebuts the <u>prima</u>

<u>facie</u> validity of the claim, the creditor must carry the ultimate

burden of proof on all aspects of the claim.

Plaintiff contends that Dealers is not entitled to recover

for any amounts it has paid to warranty claimants because it

permitted the loss of the Trust Funds by its own actions.

Specifically, based on the record as set forth in this opinion,

Plaintiff contends:

Dealers is responsible for having placed NCVA in
position to be unable to pay those claims and knowingly
obligated itself for them knowing full well that the
Trust Funds were actually not in trust to secure them.
Moreover, Dealers' conduct in both permitting the
transfers and keeping them secret directly caused
millions in losses and damages as the NCVA Trust Funds
which were to have always been at Wachovia/US Bank were
transferred out and lost, and NCVA was deprived of timely
and relevant information concerning its funds so that it
could pursue their recovery and claims against Dealers.

NCVA's damages and Dealers having paid out claims is a direct result of Dealers' conduct.

Br. Opp'n to Dealers Assurance Company's Mot. Summ. J. 23-24, ECF No. 191.   Dealers has not presented evidence in support of its claim beyond the unitemized statement attached to its claim, the Holmes Affidavit, and the underlying Insurance Contract.   The Holmes Affidavit, like the proof of claim, is simply a statement under oath, and is not entitled to any greater weight than the prima facie validity of a proof of claim for purposes of summary judgment.   For the reasons set forth herein, and construing the record in a light most favorable to Plaintiff, the record in this case is sufficient to rebut the prima facie validity of Dealers' counterclaims and to create a material issue of fact preventing the entry of summary judgment in favor of Dealers for the amounts set forth in its proof of claim or the Holmes Affidavit.   At a minimum, there is a material issue of fact as to the proximate cause of any contractual damages under Ohio law.[45]   Therefore, the Court will deny Dealers' Motion for Summary Judgment under the Insurance Agreement.

## CONCLUSION

For the reasons set forth herein, the Court will enter its orders denying the Motions for Summary Judgment.   The Court will enter an order scheduling a further pretrial hearing to consider

---

[45] See supra n. 31.

schedules for pre-trial briefing, procedures, and motions, and setting a trial date.